[Cite as *State v. Harris*, 2014-Ohio-2501.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 13AP-770 (C.P.C. No. 12CR-04-2004) |
| Jovan B. Harris, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on June 10, 2014

*Ron O'Brien*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellee.

*Yeura R. Venters*, Public Defender, and *John W. Keeling*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

SADLER, P.J.

{¶ 1} Defendant-appellant, Jovan B. Harris, appeals from the judgment of the Franklin County Court of Common Pleas convicting him of murder with a corresponding firearm specification. For the following reasons, we affirm the judgment of the trial court.

I. BACKGROUND

{¶ 2} On April 20, 2012, appellant was indicted for one count of aggravated murder, in violation of R.C. 2903.01, with a corresponding firearm specification, in violation of R.C. 2941.145. The 2012 indictment arose out of the shooting death of Mendell Campbell that occurred approximately 13 years earlier on June 30, 1998. Appellant entered a plea of not guilty to the charge, and the matter proceeded to a jury

trial.  Therein, the following relevant evidence was adduced during the case-in-chief of plaintiff-appellee, State of Ohio.

{¶ 3}  According to Columbus Police Officer Duane West, at approximately 3:00 p.m. on June 30, 1998, he was dispatched to the scene of a shooting at the intersection of Gilbert and Livingston Avenue.  Officer West was the first responder to the scene and observed the victim lying on the ground covered with a blanket.  Officer West described the victim as conscious, "still moving around," and "bleeding heavily from the groin."  (Tr. 58.)  Officer West called for an ambulance and secured the scene until additional help arrived.

{¶ 4}  Naomi Bullock testified that she was Campbell's girlfriend and witnessed Campbell's murder on June 30, 1998.  According to Bullock, she lived at 914 East Livingston Avenue, and Campbell lived nearby.  Bullock testified that, on June 30, 1998, she and Campbell were walking back from a corner store through an alley headed toward Livingston Avenue when Bullock observed a silver Ford Probe with four black male passengers sitting behind the apartments where she lived.  Bullock overheard one of the passengers loudly state "we're about to eat a fish sandwich."  (Tr. 77.)  Although Bullock understood this phrase to mean that "you're pretty much about to kill somebody," she and Campbell continued to walk normally down the alley.  (Tr. 78.)  It was not until Bullock heard someone running behind them that she and Campbell began to run.  Bullock stated that she ran down from the alley, up on to a hill, while "Von," who she identified at trial as appellant, "proceeded to chase Campbell across Livingston Avenue with [a] gun in his hand."  (Tr. 79.)  According to Bullock, appellant caught up to Campbell and shot him between four to six times with "a gun like you would see [in] an old cowboy movie" with a "spinning chamber."  (Tr. 82.)  Bullock testified that, after shooting Campbell, appellant left in the same Ford Probe she observed parked behind her apartment complex earlier.

{¶ 5}  Bullock also testified when police arrived at the scene, she provided them with all requested information, including the nickname of the shooter, "Von."  (Tr. 84.)  Bullock told officers that she knew the passengers of the Ford Probe, including Von, because they sold drugs out of 916 East Livingston Avenue, the apartment next door to hers.  According to Bullock, all four individuals moved to Columbus from Philadelphia, and the other three went by the names "Philly," "Rocks," and "Pumba."  (Tr. 71.)  Bullock

testified that she saw these individuals daily.  While speaking to police at the scene, Bullock saw the same Ford Probe drive by.  Officers stopped and impounded the vehicle.

{¶ 6}  On cross-examination, Bullock admitted to an extensive history of drug use and a prior felony conviction for receiving stolen property.  Bullock conceded that, at the time of the shooting, she was under the influence of crack cocaine.  According to Bullock, she has been sober since 2010, and her prior use of crack cocaine did not affect her ability to recall the events of June 30, 1998.  Finally, Bullock testified that approximately one year after Campbell's death, four of Campbell's family members "jumped" her because it was rumored on the street that she "set him up to be murdered."  (Tr. 119.)

{¶ 7}  According to Michael Spoonmore, Pumba, Von, and Philly sold drugs out of his mother's home at 916 East Livingston Avenue.  On June 30, 1998, as Spoonmore approached his mother's house, he testified that "a silver car come down the road, coming down Livingston, * * * and it pulled into the alley there next to the house real fast."  (Tr. 131.)  After the Ford Probe pulled into the alley, Spoonmore stated he was standing near the front of his mother's house when he heard a car door slam.  According to Spoonmore, he next saw Von, approximately 15 feet away, running through the alley with a .38 caliber gun held close to his side.  Spoonmore ran to a neighbor's house and began knocking on the back door to call 911 when he heard between five and six gunshots.  According to Spoonmore, approximately 15 seconds passed between seeing Von and hearing gunshots. Spoonmore testified that, after seeing Von, he observed Campbell getting ready to cross the street but did not witness the shooting.  Police responded, and Spoonmore discussed what he witnessed with police.  Spoonmore testified that approximately 10 to 15 minutes later, Philly approached him, his sister, and brother-in-law on his mother's front porch, and he noticed a pistol tucked in Philly's waistband.  According to Spoonmore, his relatives told Philly to "get out of there" and Philly ran.  (Tr. 143.)  Thereafter, Spoonmore testified that he saw the Ford Probe go down the road, and he told officers "there goes the car."  (Tr. 144.)

{¶ 8}  On cross-examination, Spoonmore testified he did not hear anyone make a statement regarding a "fish sandwich" nor did he see another person accompanying Campbell that day.  However, Spoonmore stated he observed Campbell alone, acting normally, and waiting to cross the street at Livingston Avenue prior to hearing gunshots.

When asked how he knew that Von, Pumba, and Philly were using his mother's house to sell drugs, Spoonmore testified he knew because he previously resided in his mother's basement.

{¶ 9}    Tracy Montgomery, owner of the Ford Probe, could not testify to the car's location on the day of the shooting, though she recalled police impounding her vehicle around the same time period as the shooting.  According to Montgomery, her son's father, Derrick Israel, was friends with someone from Philadelphia she knew as "Jovan" or "Vonnie."  Montgomery testified that, prior to the shooting, Vonnie had previously been a passenger in the Ford Probe.

{¶ 10} Paul Kushner, also known as "Poobah," testified that, on June 30, 1998, he was a passenger in the Ford Probe and witnessed the shooting.  (Tr. 189.)  According to Kushner, in 1997, he was on the run from U.S. Marshalls, and he came to Columbus, Ohio with Jamal Harris, Jovan Harris, and Kenny Bones because they heard it was a "big city and * * * could lay low."  (Tr. 202.)  According to Kushner, once they arrived in Columbus, the group supported themselves by selling crack cocaine 24 hours a day.  Kushner testified that they each sold in different locations, and appellant sold out of a drug addict's house off Livingston Avenue.  When they needed a vehicle to run errands, Kushner testified each of them had access to Montgomery's Ford Probe for transportation.

{¶ 11} Kushner testified on the day of the shooting, he received a call from Jamal, appellant's brother, who informed him that appellant had been robbed of both his drugs and money.  Kushner decided appellant should no longer sell drugs in that area, so Jamal borrowed Montgomery's Ford Probe and picked up Kushner, appellant, and the "geeker."[1] Kushner testified that Jamal was driving, appellant was in the front passenger seat, and he was in the backseat with the geeker.  According to Kushner, as the vehicle entered an alley either on the side or behind Livingston Avenue, appellant said "stop the car, and he seen somebody."  (Tr. 209.)  Kushner testified that appellant jumped out of the vehicle and approached a taller black man.  Kushner stated he saw appellant "pull a silver .38 Special, shoot the guy two times.  The guy fell.  [Appellant] let the last three bullets off in

---

[1] Kushner described a "geeker" as a crack addict that allows drug dealers to rent out his home.  Kushner testified they picked up the geeker so they could take him to a place and pay him the remainder of the rent owed before Jovan left to deal drugs at a different area.

him and turned around and ran back towards the car."  (Tr. 210.)  According to Kushner, appellant shot the individual with a five-shot "silver chrome .38 Special" revolver that loads like a "cowboy gun."  (Tr. 211, 212.)  Kushner testified that he was positive he heard five gunshots.

{¶ 12} Columbus Police Detective John Timothy O'Donnell testified that he worked to secure the scene and collect evidence.  As part of his investigation, Detective O'Donnell testified that the Ford Probe was impounded and processed for fingerprints because there was witness testimony that the suspects "went to it or came from it" after the shooting.  (Tr. 266.)  Detective O'Donnell testified that among the many items collected from the scene were a spent bullet and a cell phone recovered from the Ford Probe.  According to Detective O'Donnell, he received a tip that "Poobah's or Pumba's" actual name was Paul Kushner and, based on this information, Detective O'Donnell created a photo lineup and presented it to Bullock.  (Tr. 286.)

{¶ 13} According to Detective O'Donnell, Bullock positively identified Pumba as a passenger in the Ford Probe at the time of the shooting but specifically stated Kushner was not the shooter and not involved in the murder of Campbell.  Detective O'Donnell testified that he was unable to locate Kushner and did not issue an arrest warrant because he was "just riding in a car that the primary suspect was riding in."  (Tr. 290.)  On cross-examination, Detective O'Donnell stated that officers recovered a jacket and cell phone from the Ford Probe.  Detective O'Donnell conceded that, although in 1998 DNA tests were uncommon, a DNA test could be conducted today, and may be of value, but was not requested.  Detective O'Donnell stated because the recovery of cell phone records was "in its infancy" in 1998, there was no further investigation completed on the phone or the records pertaining to it.  (Tr. 297.)  Finally, Detective O'Donnell testified that in approximately May 1999, the case went cold.

{¶ 14} The case remained dormant until August 2011 when Columbus Police Detective Dana Farbacher received a phone call from DEA agent Bob Quinn.  Based on his conversation with Quinn, Detective Farbacher interviewed Kushner in federal prison in October 2011.  Kushner informed Detective Farbacher that appellant was the shooter on June 30, 1998.

{¶ 15} At trial, when Kushner was specifically asked why he decided to come forward, he stated that he wanted to teach appellant "a lesson." (Tr. 222.) According to Kushner, he had done numerous favors for appellant to keep him out of jail, but appellant failed to reciprocate when asked. Specifically, Kushner stated that he is currently incarcerated and serving a federal sentence of 22 years for cocaine possession with the intent to distribute. Relevant to that charge, Kushner testified that he had asked appellant to obtain an affidavit from Ebony Watson because he believed such affidavit could reduce his period of incarceration from 22 to 10 years. Appellant failed to obtain the affidavit. Thereafter, Kushner learned under Federal Rules of Criminal Procedure 35 that "if you give substantial information to the government, then you have the possibility of getting a reduced sentence." (Tr. 199.) Kushner testified that neither the federal government, state government, nor the Columbus Police Department promised him anything in exchange for his testimony, but stated he hoped Detective Farbacher would agree to write a letter on his behalf requesting a reduced sentence. On cross-examination, Kushner admitted he had two past convictions for felony possession of crack cocaine and was testifying in hopes of getting a reduction on his current federal sentence.

{¶ 16} After speaking with Kushner, Detective Farbacher attempted to corroborate Kushner's story. Detective Farbacher requested both a comparison between the fingerprints that were lifted off the Ford Probe with those of appellant's known fingerprints and an examination to determine if the projectiles recovered were .38 caliber. Appellant's prints matched a fingerprint and a palm print lifted from the passenger side door and the hood of the Ford Probe. Based on this new information, Detective Farbacher compiled new photo lineups and presented them to Bullock, Montgomery, and Spoonmore. Appellant's picture was placed in the fifth position of the photo lineup. Montgomery positively identified picture five as appellant. Although Bullock commented that picture five "looked familiar," she was ultimately unable to positively identify appellant. (Tr. 333.)

{¶ 17} Detective Steve Eppert of the Columbus Division of Police testified in December 2011, at the request of Detective Farbacher, that he presented a photo lineup to Spoonmore. According to Detective Eppert, when he showed Spoonmore the photo lineup, he positively identified appellant. Detective Eppert stated that Spoonmore "had

an emotional and a physical reaction to viewing this photo array, specifically to the Number 5 photograph" and stated "[o]h, wow, this one's popping out of my head, Number 5." (Tr. 377, 378.) Detective Eppert denoted on the photo lineup that Spoonmore stated "this guy Number 5 looks like the guy with the gun coming down the alley. When first saw Number 5, popped in my head." (Tr. 379.) According to Detective Eppert, Spoonmore was unable to positively identify the remaining passengers in the Ford Probe.

{¶ 18} Mark Hardy, supervisor of the crime laboratory for the Columbus Division of Police, testified that a spent bullet recovered from the crime scene and a spent bullet received from the county coroner's office were fired by the same .38 caliber weapon. Hardy further opined that the projectiles were fired from either a .38 special revolver or a .357 magnum revolver, which hold between five and seven rounds. When specifically asked if revolvers are like a "cowboy gun," Hardy responded, "[y]es," it is the type of gun where the "[r]ounds are loaded into a cylinder." (Tr. 434, 435.)

{¶ 19} Prior to the case being submitted for the jury's consideration, based on Kushner's testimony, appellant requested that the trial court instruct the jury on accomplice testimony pursuant to R.C. 2923.03. In denying appellant's request, the trial court reasoned that, because appellant was not charged as an accomplice, the instruction was not proper. After deliberations, the jury returned a verdict of not guilty on the aggravated murder charge, but guilty on the stipulated lesser included offense of murder, as well as the firearm specification. A sentencing hearing was held, and appellant was sentenced to an aggregate prison term of 18 years to life.

## II. ASSIGNMENTS OF ERROR

{¶ 20} Appellant brings the following assignments of error for our review:

> [I.] The trial court erred when it entered judgment against the manifest weight of the evidence presented.
>
> [II.] The trial court erred when it rejected the defendant's requested instruction regarding accomplice testimony informing the jurors that such testimony is subject to grave suspicion and is required to be weighed with great caution.

## III. DISCUSSION

### A. First Assignment of Error

{¶ 21} Appellant's first assignment of error challenges the weight of the evidence supporting his conviction for murder. Specifically, appellant asserts because Kushner, Bullock, and Spoonman all possessed "potential motives" to "falsely accuse" him of Campbell's murder, their testimonies lacked the credibility necessary to sustain a conviction for murder. (Appellant's Brief, 20.) Moreover, appellant argues that appellee's failure to present evidence of DNA analysis and phone records weighs heavily against appellant's conviction.

{¶ 22} When presented with a manifest weight of the evidence challenge, an appellate court may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *Martin* at 175.

{¶ 23} In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses. *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6. However, in conducting such review, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶ 24} Appellant was convicted of murder, in violation of R.C. 2903.02(A). R.C. 2903.02(A) provides, in relevant part, that "[n]o person shall purposely cause the death of another." Appellee's evidence at trial established that, on June 30, 1998, appellant was a passenger in a Ford Probe, he exited the vehicle near Livingston Avenue, and subsequently shot and killed Campbell with a .38 caliber revolver. Specifically, Kushner

and Bullock each testified they saw appellant chase and shoot Campbell. Additionally, though not a witness to the actual shooting, Spoonmore testified that he saw appellant with a gun in the same area as Campbell and then heard five or six gunshots.

{¶ 25} Appellant attacks the credibility of these witnesses and suggests these witnesses had their own personal motives for falsely accusing appellant. The jury, however, was privy to the testimonies of Kushner, Bullock, and Spoonmore, including potential motives to be untruthful. The jury was also privy to any inconsistencies presented between or within each witness's testimony. It is within the province of the trier of fact to determine the credibility of each witness. A manifest weight review requires the appellate court to "bear in mind the trier of fact's superior, first-hand perspective in judging the demeanor and credibility of witnesses." *State v. Mickens*, 10th Dist. No. 08AP-626, 2009-Ohio-1973, ¶ 30. Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds. *State v. G.G.*, 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7. Because the jury is in the best position to determine the credibility of each witness by taking into account inconsistencies, as well as each witness's manner and demeanor, we cannot conclude this record presents a scenario where the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

{¶ 26} Appellant cites to *State v. Manago*, 38 Ohio St.2d 223, 227-28 (1974), for the proposition that failure of the state to present DNA evidence with regard to a jacket recovered from the Ford Probe as well as evidence of Campbell's cell phone records weighs heavily against appellant's conviction. Based on the evidence presented in the matter before us, we disagree and find *Manago* to be inapplicable.

{¶ 27} For the above stated reasons, we conclude appellant's conviction for murder is not against the manifest weight of the evidence.

{¶ 28} Accordingly, appellant's first assignment of error is overruled.

**B. Second Assignment of Error**

{¶ 29} In appellant's second assignment of error, he contends, in light of Kushner's testimony, that the trial court erred in refusing to instruct the jury on the issue of accomplice testimony as required by R.C. 2923.03(D). "A trial court is responsible for providing all jury instructions that are relevant and necessary for the jury to weigh the

evidence and determine the facts." *State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 59, citing *State v. Moody*, 10th Dist. No. 98AP-1371 (Mar. 13, 2001). The trial court's instructions should outline the issues, state the applicable principles of law, and clarify the jury's role in the case. *Id.* A jury instruction is proper when the jury is adequately informed of the law. *Id.* We review the trial court's refusal to give a requested jury instruction for an abuse of discretion under the facts and circumstance of the case. *Id.*, citing *State v. Smith*, 10th Dist. No. 01AP-848 (Apr. 2, 2002).

{¶ 30} Appellant requested the accomplice instruction language from R.C. 2923.03(D) which "requires the trial court to instruct the jury that 'the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and requires that it be weighed with great caution.' " *Jennings* at ¶ 60. Appellant argues, without legal citation, that because testimony presented at trial established that Kushner was an accomplice to Campbell's murder, the trial court was required to provide the accomplice testimony instruction. According to appellant, because he and Kushner were involved in the same illegal drug trade and because he and Kushner both arrived at and left the scene together, Kushner was an accomplice. We disagree.

{¶ 31} In *Jennings*, the trial court refused the defendant's request to instruct the jury on the issue of accomplice testimony. In interpreting the definition of "accomplice" for purposes of R.C. 2923.03(D), we concluded " 'an instruction under R.C. 2923.03(D) "is not required when the witness is not charged with complicity as a result of involvement with the defendant's criminal activities." ' " *Id.* at ¶ 63, quoting *State v. Olverson*, 10th Dist. No. 02AP-554, 2003-Ohio-1274, ¶ 54, quoting *State v. Sillett*, 12th Dist. No. CA2000-10-205, 2002-Ohio-2596, ¶ 14. We ultimately held, because "the state never charged [the witness] with complicity or any other crime for his involvement in defendants' criminal activities * * *, the trial court did not abuse its discretion in refusing to give the requested accomplice instruction." *Id.* at ¶ 64.

{¶ 32} Here, Kushner was neither charged nor convicted of complicity or any other crime for his involvement in the events of June 30, 1998. Although appellant argues Kushner "could" have been charged as an accomplice, we held in *Jennings* that "the possibility that a witness 'could' have been indicted as an accomplice does not require the

trial court to instruct on accomplice testimony."  *Id.* at ¶ 66.  Moreover, to the extent appellant argues the accomplice instruction was required because Kushner may receive favorable treatment as a result of his testimony, we determined in *Jennings* that, where no consideration is given in exchange for testimony, no accomplice instruction is required.  *Id.*  Kushner specifically testified that he received no consideration in exchange for his testimony.  Thus, we find the trial court did not abuse its discretion in refusing to give the requested accomplice instruction.

{¶ 33}  Accordingly, appellant's second assignment of error is overruled.

## IV.  CONCLUSION

{¶ 34}  Having overruled appellant's two assignments of error, we hereby affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

CONNOR and LUPER SCHUSTER, JJ., concur.

_____