[Cite as *State v. F.A.M.*, 2016-Ohio-7129.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT


| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 15AP-1114 |
| v. | : | (C.P.C. No. 15CR-564) |
| [F.A.M., III], | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on September 30, 2016

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Steven L. Taylor*, for appellee.

**On brief:** *Yeura R. Venters*, Public Defender, and *George M. Schumann*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Defendant-appellant, F.A.M., III, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of rape of a person less than 13 years of age, in violation of R.C. 2907.02(A)(1)(b). For the reasons that follow, we affirm.

I. FACTS AND PROCEDURAL HISTORY

{¶ 2} The victim in this case, M.O., was born in July 2003. On or about December 10, 2014, M.O. resided at appellant's home on Rendezvous Lane in Columbus, Ohio, along with her aunt, A.G., appellant's three-year old daughter, and appellant's brother "Tony."[1] A.G. had been caring for M.O. for some time before they moved in with

---

[1] Appellant testified that his older brother is M.L., but he calls him "Tony. Actually Little Tony to be specific." (Tr. Vol. 2 at 321.)

appellant because both of M.O.'s parents were imprisoned.  Appellant was A.G.'s longtime boyfriend.

{¶ 3}  M.O. was 12 years old at the time of trial.  She related the events that led to appellant's arrest during her trial testimony.  She recalled that in the weeks leading up to December 10, 2014, appellant had begun making unwelcomed comments of a sexual nature.  She was ten years old at the time.  According to M.O., appellant had showed her a video on his cell phone of "a girl rubbing a boy part" and stated that he was going to "stick [his] finger in [her] butt."  (Tr. Vol. 1 at 33, 64.)  M.O. recalled that appellant also said "something about a blow job" and that he "grabbed my boob."  (Tr. Vol. 1 at 32, 33.) When M.O. told her aunt about appellant's behavior, her aunt told her appellant "was playing around, just messing with her."  (Tr. Vol. 1 at 65.)

{¶ 4}  M.O. testified that on December 10, 2014, "I was sexually assaulted."  (Tr. Vol. 1 at 24.)  On that evening, appellant woke her and told her "it was time for him to stick my – his finger in my butt hole," and for her to "get on the floor."  (Tr. Vol. 1 at 25.) M.O. stated that appellant told her to get on the floor because her bed was squeaky.  M.O. complied with appellant's demands, and she placed her "elbows on the ground with my butt up."  (Tr. Vol. 1 at 26.)  According to M.O., appellant pulled down her pajama bottoms and underwear and put lotion "on my butt cheeks and my butt hole."  (Tr. Vol. 1 at 26.) M.O. described what happened next as follows:

> Q.  And then what happened?
>
> A.  He pulled down his pants a little bit and stuck his boy part in mine, in my butt.
>
> Q.  Okay.  So he put his boy part in your butt.  Did it go in your butt hole?
>
> A.  Um-hmm.
>
> Q.  Then what happened next?
>
> A.  He moved his hips ten times and said okay and told me "good night" and left the room.  And he came back later asking for his cigarettes.

Q. Okay. Let me back up a little bit. You said he put his boy part in your butt hole.

How do you know it was his boy part?

A. Because his hands were on my back.

Q. Okay. So you could feel his hands on your back?

A. (Indicates affirmatively.)

Q. All right. And could you see his boy part?

A. Huh-uh.

Q. All right. Do you know if he had anything on his boy part?

A. No.

Q. Do you know if anything came out of his boy part?

A. No.

(Tr. Vol. 1 at 27-28.)

{¶ 5} M.O. testified that after the assault, she went to the rest room and defecated. The next morning, M.O. went to school wearing the same underwear she had worn the prior evening. According to M.O., she wore the same underwear to school because "I just wanted to have evidence so that they would believe me." (Tr. Vol. 1 at 68.) At the office of her school counselor, K.S., M.O. told K.S. what appellant had done. At trial, K.S. recalled that M.O. was "upset" and appeared "shaken" and that she was "nervous when she was talking." (Tr. Vol. 1 at 87.) M.O. testified that police officers arrived at school and took her to Nationwide Children's Hospital ("Children's Hospital") where she was interviewed, and "[t]hey inspected me." (Tr. Vol. 1 at 31.)

{¶ 6} Jennifer Westgate is a licensed social worker and forensic interviewer. The trial court declared Westgate an expert in medical forensic interviewing. On December 11, 2014, Westgate was working at the Children's Advocacy Center ("CAC") in Children's Hospital. Westgate testified that in the five and one-half years she has been employed at Children's Hospital, she has conducted more than 1,500 interviews of children between

the ages of 3 and 13 regarding allegations of abuse. Westgate recalled what M.O. told her during the interview:

> A. She said that he [appellant] had been making comments or threats to her for a two-month period of time that he was going to stick his finger in her butt hole. He had told her that if she wanted to get out of punishment, she could give him a blow job. He showed her a video of a woman masturbating another person until they ejaculated.
>
> She talked about an incident a couple days prior to my interview with her where he came into her room, asked her what her breasts felt like, and touched her boobs on top of skin. And then she talked about the day before I interviewed her, her – him coming into her bedroom and asking her to get on the floor, because the bed was squeaky, pulling down her pants and her underwear, pulling down his pants. She said she was on her forearms on her elbows on the floor with her butt in the air. And then she said he put his boy part in her butt.
>
> Q. Was she identifying the male penis as the boy part?
>
> A. Yes, ma'am.
>
> Q. Okay. And did she say what happened after he put his boy part in her butt?
>
> A. She said he raped her. I asked her to tell me what that meant. And she said he was moving his waist area back and forth like ten times, and then she said he stopped. And she – and he said "okay" and "good night," and he left.
>
> Q. Did you ask her about whether or not the Defendant was wearing a condom?
>
> A. Yes, ma'am.
>
> Q. And what did she say to that?
>
> A. I believe she told me that he didn't have anything on his boy part.
>
> Q. And what about ejaculation, did you ask her about that?
>
> A. Yes, ma'am.

Q.  And what did she say?

A.  She said no.

(Tr. Vol. 1 at 115-16.)

{¶ 7}   A registered nurse by the name of Gail Horner was the next person to see M.O. at the hospital.  The trial court declared Horner an expert in the field of child sex abuse examination.  She conducted an anogenital examination of M.O. for purposes of completing a "rape-evidence kit."  (Tr. Vol. 1 at 152.)  She collected swabs from M.O.'s rectal and genital areas and from her clothing, including her underwear.  According to Horner, M.O. told her "about her aunt's boyfriend putting his penis in her anus and that he had exposed her to pornography. * * * He had also touched her breast."  (Tr. Vol. 1 at 151.)  Horner testified that she did not find any evidence of anal trauma but that such evidence was rare in these cases.  Though she found no evidence of semen on M.O.'s rectal area, she stated that in a "vast majority" of cases no such evidence is found on the victim's body.  (Tr. Vol. 1 at 159.)  She did find evidence that M.O. had urinated and defecated but no evidence that she had showered after the incident.

{¶ 8}   Officer James Shockey testified that he is a member of a multi-disciplinary unit of the Columbus Division of Police known as the Special Victims Unit.  Shockey stated that his unit is tasked with investigating allegations of sexual abuse of any minor less than 15 years of age.  Shockey testified that he observed the initial interview with M.O. at CAC through a one-way glass.  Shockey obtained a search warrant for appellant's home based on the information revealed by M.O.  Appellant arrived home while Shockey and other officers were gathering evidence.  Shockey took appellant into custody.  In a subsequent interview, appellant denied the allegations of sexual abuse and voluntarily gave police a DNA sample.  Appellant was released later that day.  Shockey testified that he subsequently retrieved the rape evidence kit from Children's Hospital and submitted it to the lab for testing.

{¶ 9}   On January 26, 2015, Columbus police arrested appellant on charges of rape, gross sexual imposition, and disseminating material harmful to children.  On February 4, 2015, a Franklin County Grand Jury indicted appellant on two counts of rape of a person less than thirteen years of age, in violation of R.C. 2907.02(A)(1)(b), a felony

in the first degree, and one count of gross sexual imposition of a person less than thirteen years of age ("GSI"), in violation of R.C. 2907.05, also a felony in the first degree. The grand jury indicted appellant on an additional count of disseminating matter harmful to juveniles, in violation of R.C. 2907.31, a fourth-degree felony. The indictment alleges that the two counts of rape occurred on December 10, 2014, the GSI occurred on December 8, 2014, and appellant disseminated matter harmful to juveniles from November 1 to November 30, 2014.

{¶ 10} On November 13, 2015, a Franklin County jury returned a verdict of guilty as to count two of the indictment charging appellant with rape of a person less than thirteen years of age, the "sexual conduct" being anal intercourse. *See* R.C. 2907.01(A). The jury found appellant not guilty as to the other charges in the indictment. The trial court convicted appellant of rape, in violation of R.C. 2907.02(A)(1)(b), and imposed a prison term of ten years to life.

{¶ 11} Appellant timely appealed to this court from the judgment of the trial court.

## II.  ASSIGNMENT OF ERROR

{¶ 12} Appellant's sole assignment of error is as follows:

The verdict is against the manifest weight of the evidence.

## III.  STANDARD OF REVIEW

{¶ 13} A challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), *superseded by constitutional amendment on other grounds, State v. Smith*, 80 Ohio St.3d 89 (1997). When presented with a manifest-weight challenge, an appellate court may not merely substitute its view for that of the trier of fact but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *Martin* at 175.

{¶ 14} In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses.  *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6.  However, in conducting such review, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' "  *Id.*, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "Accordingly, we afford great deference to the jury's determination of witness credibility."  *State v. Albert*, 10th Dist. No 14AP-30, 2015-Ohio-249, ¶ 14.  "Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds."  *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 25, *appeal not allowed*, 140 Ohio St.3d 1455, 2014-Ohio-4414, citing *State v. G.G.*, 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7.

{¶ 15} Similarly, a jury may take note of the inconsistencies in a witness's testimony and resolve or discount them accordingly, but the mere existence of such inconsistencies does not render defendant's conviction against the manifest weight of the evidence.  *State v. Dillon*, 10th Dist. No. 04AP-1211, 2005-Ohio-4124, quoting *State v. Nivens*, 10th Dist. No. 95APA09-1236 (May 28, 1996).  *See also State v. Lakes*, 120 Ohio App. 213, 217 (4th Dist.1964) ("It is the province of the jury to determine where the truth probably lies from conflicting statements, not only of different witnesses but by the same witness."); *State v. Harris*, 73 Ohio App.3d 57, 63 (10th Dist.1991) (even though there was reason to doubt the credibility of the prosecution's chief witness, he was not so unbelievable as to render verdict against the manifest weight).

## IV.  LEGAL ANALYSIS

{¶ 16} In appellant's sole assignment of error, appellant challenges his conviction as being against the manifest weight of the evidence. Because appellant has not challenged the sufficiency of the evidence, appellant acknowledges that the evidence presented by plaintiff-appellee, State of Ohio, if believed, was sufficient to convince the jury he was guilty of rape beyond a reasonable doubt.

{¶ 17} Appellant took the witness stand in his own defense.  He denied the allegations against him and offered an alibi.  Appellant testified that on December 10, 2014, he left work with his brother Tony and stopped at his home to get some clothes for

the gym. He recalled that M.O. was home at that time. According to appellant, he and Tony went to the gym where they worked out for one to two hours. Appellant then left the gym with Tony and went to the home of his cousin, D.B., to work on D.B.'s car. According to appellant, D.B. lived in Shadesville, Ohio, which was 15 to 17 miles away from the gym. Appellant maintains that he worked on D.B.'s vehicle through the night until approximately 7:30 a.m. Appellant acknowledged that he had been up for roughly 24 hours when he and Tony left D.B.'s house and headed back to appellant's home.

{¶ 18} Appellant testified that he stopped at his home briefly to grab some snacks before heading back to work. Appellant stated that M.O. was not at home when he arrived because she typically catches the school bus at 7:45 a.m. Appellant worked his normal shift that day, and he and Tony left work at 4:30 p.m. When they arrived at appellant's home, appellant was surprised when he did not find M.O. at home. Appellant testified that he became worried about M.O. because she should have been home from school at that hour. Appellant called A.G. to find out if she knew where her niece could be. When A.G. told him M.O. should be at home, appellant and Tony began looking for her at school, then at her friend's home, and finally at his grandmother's house. Appellant subsequently received a call from A.G. informing him that M.O. was at "Children's Services." (Tr. Vol. 2 at 341.)

{¶ 19} Appellant testified that he suspected that M.O. was making a report about discipline he had handed out on December 9, 2014, when he made M.O. stand in the corner. However, when appellant returned home from his grandmother's house, he found police officers waiting to take him into custody. Appellant testified that he was taken to police headquarters where he was interrogated for nearly one hour before investigators told him of M.O.'s allegations of rape. Appellant claims that he told Shockey where he had been for the last day and one-half but that no one from the police department ever contacted D.B. or Tony to verify his alibi. Appellant testified that he gave police a DNA sample voluntarily because he "didn't have nothing to hide." (Tr. Vol. 2 at 331.)

{¶ 20} Appellant called his half sister, M.M., to testify on his behalf. M.M. was "13 going on 14" when she and her mother and stepfather moved into appellant's house and stayed there for approximately one and one-half year to two years. (Tr. Vol. 2 at 288.) M.M., who was 15 years old at the time of trial, recalled that when she was living in

appellant's home in 2014, she revealed that her brother had sexually assaulted her when she was 8 years old. She related that she and M.O. subsequently discussed this revelation with appellant and M.M.'s parents and that she and M.O. were told to confide in a responsible adult if such a thing ever happened to them. The adults also told her and M.O. that the offender could get in a great deal of trouble for such conduct. M.M. also recalled that she had, on one occasion, viewed soft-core pornography with M.O. on television. She also claimed that M.O. had pornographic materials on her tablet computer.

{¶ 21} Appellant contends that the testimony of M.O. is not worthy of belief because she had a strong bias against him and a reason to lie. According to appellant, he had punished M.O. on the day before the incident by making her stand in the corner. Appellant testified that "she was awfully mad at me at that point." (Tr. Vol. 2 at 354.) Appellant also testified that M.O. had expressed a strong desire to return to her mother who had recently been released from prison, and he suggested that she concocted this false story about rape so that authorities would return her to her mother. Appellant notes on cross-examination that M.O. agreed she was "disappointed" when she was not permitted to return to her mother after her mother was released from prison. (Tr. Vol. 1 at 43.) Appellant claims that M.O. was motivated to make up a story about appellant so she could be returned to her mother. Appellant further claims that after hearing M.M.'s story about a sexual assault and after viewing pornography on television and on the internet, M.O. had the "sexual knowledge" she needed to fabricate a claim of rape. (Appellant's Brief at 24.)

{¶ 22} In conducting a manifest weight review, this court presumes that the jury is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony. *Cattledge*; *Seasons Coal*. We must afford great deference to the jury's determination of witness credibility. *Albert* at ¶ 14. The trial court in this case instructed the jury to "apply the tests of truthfulness which you apply in your daily lives," including "the appearance of each witness upon the stand; the witness's manner of testifying; the reasonableness of the testimony; the opportunity the witness had to see, hear, and know the things concerning the testimony; the accuracy of the witness's memory; frankness or the lack of it;

intelligence; interest and bias, if any, together with all the facts and circumstances surrounding the testimony." (Tr. Vol. 2 at 417.)

{¶ 23} Here, M.O. gave a detailed account of the sexual assault by appellant during her trial testimony. She told the same story to her counselor, K.S., at school the day after the incident and she subsequently told the same story to investigator Westgate and nurse Horner at Children's Hospital, including the claim that appellant showed her pornography and grabbed her breast. The record shows that M.O. did not waiver in her account of the sexual assault at any point in time, including her cross-examination by appellant's trial counsel.

{¶ 24} By contrast, appellant's testimony regarding his alleged alibi and his claims regarding his broken cell phone seem less plausible. Though appellant is critical of police for not interviewing either his cousin D.B. or his brother Tony regarding his whereabouts on the day in question, appellant did not call either man as a witness in his defense. Had either man been willing and able to corroborate appellant's claims, it is reasonable to conclude that appellant would have called them as a witness. Appellant also admitted at trial that he did not know his cousin's address. He did state that he believed A.G. gave D.B.'s phone number to the investigating officers following his December 11, 2014 arrest and interrogation. Appellant, however, did not call A.G. as a witness at trial.

{¶ 25} With regard to the cell phone, police requested to see appellant's cell phone on December 11, 2014, in order to investigate M.O.'s allegation that he showed her pornography. Appellant claimed that he did not have the phone with him. Appellant later produced his cell phone but it was broken and the data irretrievable. At trial, appellant explained that he must have lost his cell phone while he was on his way home from his grandmother's house on December 11, 2014, just prior to his arrest. Appellant claims that he found the cell phone in his yard a few days later, but it was broken.

{¶ 26} Our review of the evidence in the record reveals that the jury had reasons to doubt appellant's story. Moreover, even if the jury were to accept appellant's claim that M.O. had a bias against him and that she had reason to level false allegations against him, the physical evidence presented by appellee corroborated M.O.'s testimony. Annette Davis works in the forensic biology section of the Ohio Bureau of Criminal Identification ("BCI"). She testified that her job is to "screen items of evidence for biological stains and

then compare them for DNA analysis." (Tr. Vol. 2 at 211.) The trial court declared Davis an expert in the fields of DNA analysis and forensic biology. Davis testified that she analyzed the evidence in the rape evidence kit pertaining to M.O. According to Davis, she found semen on M.O.'s underwear and trace amounts of semen on the anal swab and the buttocks and skin swab. She also found sperm cells present on the rear section of the underwear and on both the buttocks swab and anal swab. Davis related that she found a small number of sperm cells on the buttocks and anal swabs but that she found a larger quantity of sperm cells on the underwear. Though Davis acknowledged on cross-examination that it was possible that the presence of appellant's semen on the items in the rape evidence kit was the result of a secondary transfer, she opined on direct examination that the presence of semen was more consistent with anal drainage.

{¶ 27} Katherine Hall, a BCI forensic scientist, analyzed the evidence contained in the rape evidence kit. The trial court declared Hall an expert in DNA analysis. According to Hall, the anal swab taken from M.O. revealed the presence of sperm and a mixture of M.O.'s DNA and appellant's DNA. With regard to the "DNA specific" of that sample, Hall opined that "142,800,000 unrelated individuals * * * would have to be tested until I found one DNA profile that would be similar to the DNA profile from the sperm fraction in this sample." (Tr. Vol. 2 at 268.) Hall testified that the swab taken from M.O.'s underwear also contained a mixture of M.O.'s DNA and appellant's DNA. According to Hall, "the statistical estimate [is that] there is 5 quintillion 255 quadrillion unrelated individuals that I would have to test in order to find one individual that had a similar profile that was exhibited in the sperm fraction of the sample from the underwear." (Tr. Vol. 2 at 269.) Hall opined that the approximate number of individuals currently alive on earth is seven billion.

{¶ 28} Appellant made an effort to explain the presence of his sperm on M.O.'s person and on her underwear during his direct examination. Appellant speculated that semen on clothing that he had used to clean himself after having sex with A.G. had been transferred to M.O.'s underpants, intentionally or otherwise, when the two garments were comingled in a pile of dirty clothes. Appellant further speculated that M.O. had retrieved the soiled underwear and wore them to school. On cross-examination, however, appellant

acknowledged that A.G. had been suffering from a bladder infection on or about the time of this incident and that he had last had sex with A.G. three days before the incident.

{¶ 29} As earlier noted, an appellate court should reserve a conviction as being against the manifest weight of the evidence only in the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *Martin* at 175. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a ' "thirteenth juror" ' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.*, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). "[T]he appellate court weighs the evidence in order to determine whether the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *In re M.C.*, 10th Dist. No. 12AP-618, 2013-Ohio-2109, ¶ 70, citing *Thompkins* at 387.

{¶ 30} Our review of the record convinces us that this is not one of those exceptional cases where the evidence weighs heavily against the conviction. Nor can we disagree with the jury's resolution of the conflicting testimony. In our view, M.O. provided believable testimony regarding the sexual assault she endured at the hands of appellant. Her trial testimony was consistent with the statements she had made to several investigators prior to trial. The physical evidence introduced by appellee and the expert opinion testimony regarding such evidence largely corroborated M.O.'s testimony. By contrast, the jury had a reasonable basis to disbelieve appellant's uncorroborated alibi testimony. On this record, we cannot say that the jury clearly lost its way in concluding that appellant raped M.O. on December 10, 2014.

{¶ 31} For the foregoing reasons, appellant's assignment of error is overruled.

## V. CONCLUSION

{¶ 32} Having overruled appellant's sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

DORRIAN, P.J., and BRUNNER, J., concur.

_____