[Cite as *State v. Martin*, 2025-Ohio-89.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                    :

    Plaintiff-Appellee,                          :

                                        No. 23AP-340
v.                                               :        (C.P.C. No. 18CR-2391)

Christopher W. Martin,                           :        (REGULAR CALENDAR)

    Defendant-Appellant.                         :

---

D E C I S I O N

Rendered on January 14, 2025

---

**On brief:** [*Shayla D. Favor*], Prosecuting Attorney, and *Michael A. Walsh*, for appellee.

**On brief:** *Brian J. Rigg*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

BOGGS, J.

{¶ 1}  Defendant-appellant, Christopher W. Martin, appeals the judgment of the Franklin County Court of Common Pleas convicting him of aggravated murder, murder, voluntary manslaughter, and kidnapping.  For the reasons herein, we affirm his conviction.

## I.  PROCEDURAL HISTORY AND FACTS

{¶ 2}  On May 17, 2018, a Franklin County Grand Jury indicted Martin on two counts of aggravated murder, both unclassified felonies; two counts of murder, both unclassified felonies; and one count of kidnapping, a first-degree felony.  The events surrounding the charged offenses occurred on May 9, 2018, at his apartment at 1008 Parsons Avenue in Columbus.

{¶ 3}  Over the course of a week-long trial, the state presented 11 witnesses.  The jury heard testimony from William Mitchell, who lived in a house behind 1008 Parsons Avenue, which was a building with retail space on the first floor and studio apartments on

the second floor. Mitchell testified that around 5:00 pm on May 9, 2018 he was at his home when he heard a woman scream. Mitchell stated that he looked out a window from the second floor of his home to see a woman trying to crawl out of an apartment window on to a flat roof at 1008 Parsons Avenue. Mitchell said the woman was screaming that "she couldn't breathe, and that's when I saw someone – saw a gentleman reach out from behind, grabbed her by the throat and dragged her back in the apartment." (Apr. 4, 2023 Tr. Vol. 2 at 239.) Mitchell testified that she was over halfway out the window and was trying to crawl out and was repeatedly yelling for help. Mitchell stated that he then saw another woman, Savonne Lemon, from a different apartment at 1008 Parsons Avenue come out onto the flat roof in response to the noise. Mitchell and Lemon made eye contact and he pointed her to the source of the screams and told her to call 911 to which she responded, "I got you." *Id.* at 254.

{¶ 4} The jury also heard from Lemon, who testified that on May 9, 2018, she had returned to her apartment at 1008 Parsons Avenue with her children when she heard muffled noises and yelling. She walked out on the roof to determine where the sound was coming from and then saw Mitchell pointing toward the other apartment window a couple units down. That was when she saw "a tussle" happening between a man and a woman. Lemon testified that she heard the woman yell for help and that she couldn't breathe. Lemon stated that the woman was fighting back against the man who had grabbed her by the throat, and that the woman was attempting to flee. Lemon then reached out to one of her neighbors who had called 911.

{¶ 5} The jury heard from Sarah Sprague, a Columbus Police 911 call-taker who answered the 911 call on May 9, 2018.

{¶ 6} The jury also heard from Columbus Police Officer Adam Sadler, one of the first officers to be dispatched to 1008 Parsons Avenue for the reported fight. Officer Sadler stated that when he arrived at 1008 Parsons Avenue another officer was talking to a woman standing at the door to the building. The two officers headed into the building and went to the apartment where they were told the fight was. Officer Sadler testified that after they knocked on the door, he heard noises inside the apartment that sounded like running water, large objects being moved around, and someone asking from inside who was there. They stated that they were the police, and that the person should come to the door. Officer Sadler

heard more noises before the door was partially opened and stated that the man who opened the door had to climb over something to do so. Officer Sadler said the person who opened the door was an African American male wearing a tank top, had blood all over him, and did not have any visible injuries. Officer Sadler testified that the man lay down on the ground, put his hands behind his back and Officer Sadler ordered the other officer to handcuff the man. Officer Sadler identified the man he encountered at the apartment as the appellant, Christopher Martin.

{¶ 7}   Officer Sadler then saw someone lying on the floor at the end of the entry hallway into the studio apartment. He climbed over some furniture that was blocking the doorway and found a woman on the floor. Officer Sadler stated that she was in terrible shape, that "[s]he had blood all over her face, blood on her body. There's blood soaking into the carpet and she was motionless." (Tr. Vol. 2 at 339.) Officer Sadler radioed for a medic and then attempted to render aid. He testified that

> [w]hile I was wiping the blood off of her neck and face and chest, I saw just stab wound upon stab wound just all over. I tried to keep direct pressure on them as best I could. At one point, I remember seeing an air bubble pop in her nostril, and I didn't know if that was her last breath. I didn't know if she had been gone. She was still warm to the touch. At that point, I started CPR while still trying to keep pressure on the wound as best I could.

(Tr. Vol. 2 at 342.)

{¶ 8}   Officer Sadler testified that after the medics arrived they took over CPR and attempted multiple advanced steps to try to save her life, even drilling into her shin bone to start a line as her injuries were so severe. Officer Sadler stated that she was eventually transported to Grant Hospital where she was pronounced dead. A medic was called for Martin, but he was not transported to the hospital.

{¶ 9}   Columbus Police Sergeant John Standley testified that he took photographs of the apartment at 1008 Parsons Avenue. The photographs showed a large blood stain on the carpet, blood splatters throughout the studio apartment, and multiple knives. The jury also heard testimony from Gary Cooper with the Columbus Police Department, Crime Scene Search Unit. Mr. Cooper testified that he was called by the Franklin County Coroner's Office on May 10, 2018, to collect forensic evidence from the identified victim, Erika Denise Daniels. Mr. Cooper testified that he took fingernail scrapings from Erika for testing.

{¶ 10} William Daniels testified and confirmed the identity of the woman who was stabbed at 1008 Parsons Avenue as his daughter, Erika.

{¶ 11} The trial court also heard testimony from Columbus Police Detective Kevin Jackson, who took blood from Erika's body from the coroner's office to the Columbus Police Department.

{¶ 12} The state then called Miranda Smith, a forensic scientist in the DNA Section of the Columbus Police Crime Laboratory, who completed an analysis and report of the incident. Smith compared the DNA evidence from the crime scene with buccal swabs from Martin and a blood sample from Erika. Smith testified that she did analyses of swabs from various surfaces in the studio apartment, from Erika's fingernail scrapings, and from the knives that were found at the scene. Nearly all of the swabs from the apartment tested positive for blood. Smith testified that testing of the blood found on the north wall closet door indicated that it came from Martin and Erika. Smith also testified that the DNA profile from swabs taken on the blades of the two knives and from the wall of the studio apartment were likely to originate from Erika. Smith testified that she tested the samples taken from the handles of the knives. The DNA evidence on the first handle was likely to originate from Martin and Erika, with more DNA profile present from Erika. The testing of the second knife handle also indicated that the DNA profiles were from Martin and Erika, but that Martin had more DNA present on that knife handle. Smith further testified that the testing of samples from underneath Erika's fingernails and hands indicated the DNA profile was from Martin and Erika.

{¶ 13} The court then heard testimony from Daniel Douglas, formerly with the Columbus Police Department's, Crime Scene Search Unit. Douglas testified that he took photos of and buccal swabs from Martin the night of May 9, 2018.

{¶ 14} Finally, the state called Dr. John Daniels with the Franklin County Coroner's Office, who served as substitute coroner for the autopsy of Erika. Dr. Daniels noted that Erika's toxicology report was positive for ethanol. Dr. Daniels catalogued 26 stab wounds on Erika that ranged from her neck, chest, under the chin, left hand, in the buttocks, and the vagina. Several stab wounds were deep enough to perforate the trachea, thyroid cartilage, the left ventricle of the heart, injure her lungs, and transect her right carotid

artery. Dr. Daniels concluded that the manner and cause of death was homicide from multiple stab wounds of the neck and chest.

{¶ 15} Thereafter, the state moved to admit various exhibits into evidence, and Martin moved to dismiss all charges pursuant to Crim.R. 29. The trial court denied Martin's motion, stating that the court found "sufficient evidence to sustain conviction of offenses" in counts one through five. (Apr. 5, 2023 Tr. Vol. 3 at 615.)

{¶ 16} Martin then elected to testify in his own defense. He testified that he met Erika at a bus stop, realized they were working at the same place and began dating soon after. Martin described their relationship as "up and down," that they would frequently stay at each other's apartments and get into arguments. He stated that frequently one person would leave but they would ultimately come back to each other.

{¶ 17} Martin testified that on May 9, 2018, he and Erika had been drinking and had made plans for Martin's nephew to come over to the studio apartment at 1008 Parsons Avenue. Martin stated that Erika went to a store to get more beer and returned to find Martin texting. Martin testified that she seemed curious as to who he was texting but did not ask him about it. Martin stated that he had stopped drinking and had laid down when he and Erika began to have what he characterized as a "little dispute." (Apr. 7, 2023 Tr. Vol. 4 at 658.) He testified that they both had been laying down and that he roused when she got up to go to the kitchen to look at a cell phone, but that he fell back asleep.

{¶ 18} Martin testified: "I don't even remember waking up all the way. I just remember we was kind of, like, tussling over a knife. * * * But I kind of got the – I got the knife from her. * * * I put the knife on the – on the table." Martin said that he told Erika to leave. (Tr. Vol 4 at 659.) Martin stated that Erika refused to leave, and he then threatened to call the police. Martin stated that Erika became angry and started banging on the wall and yelling "help." He testified that she then knocked the screen out of his window and began yelling out the window for help and saying she couldn't breathe. Martin stated he got on the bed to see what she was doing and if she could fall out. He stated that he and Erika began to tussle until he stopped and fell back on the bed. He then said that Erika went into the kitchen and grabbed another smaller knife, which he also took from her. Martin picked up one of the previously discarded knives when Erika went to the kitchen to get a third knife. Martin said that Erika jumped toward him with the knife, that he fell back,

and that Erika was on top of him. Martin testified that he was holding her off with one hand. Martin said his grip slipped and he thought he had been stabbed in the neck and had tried to move his arm to block the knife. He then said he felt "like a ball of energy just was shot into me" and that his right arm was moving up in an impulse and that it was an "outer body experience." (Tr. Vol. 4 at 670-71.)

{¶ 19} Martin stated that he tried to call 911 but was so flustered he thought he dialed incorrectly. Martin said he heard helicopters and began to panic and then attempted to call 911 again shortly before the police arrived.

{¶ 20} Martin testified that he did not have any prior plans or calculation or design to kill Erika and that he had no intention or purpose to terrorize her. Martin claimed that he was attempting to see what Erika was doing at the window, namely if she was trying to get him in trouble or if she was going to try to jump off. He said he wanted her to leave and that he did not have a purpose to terrorize her or cause physical injuries. After Martin's testimony, the defense renewed its Crim.R. 29 motion for acquittal, which the trial court again denied.

{¶ 21} On April 7, 2023, the state dismissed Count 4 of the indictment. The trial court gave instructions to the jury on the remaining counts, and the jury began its deliberations. On April 11, 2023, the jury told the court that it was deadlocked on three charges, after which the trial court read *Howard* charge instructions.

{¶ 22} On April 12, 2023, the jury reached a verdict and found Martin not guilty of aggravated murder under Count 1, but guilty of the lesser-included offense of voluntary manslaughter in violation of R.C. 2903.03, a felony of the first degree. The jury found him guilty of aggravated murder in violation of R.C. 2903.01, an unclassified felony, in Count 2. The jury found him guilty of murder in violation of R.C. 2903.02, an unclassified felony, under Count 3, as well as guilty of kidnapping in violation of R.C. 2905.01, a felony of the first degree, under Count 5.

{¶ 23} On May 10, 2023, the trial court sentenced Martin to life with eligibility for parole after 30 years as to Count 2, which was merged with Count 1 and Count 3, and 11 years as to Count 5. The trial court found that those sentences should run consecutively for a total sentence of life with eligibility for parole after 41 years at the Ohio Department of Rehabilitation and Corrections.

{¶ 24}  Martin now appeals his conviction.

## II. ASSIGNMENTS OF ERROR

{¶ 25}  Martin argues the following assignments of error:

>  (1) The trial court erred when it denied Christopher Martin's Rule 29 Motion for Acquittal.
>
>  (2) The verdict of guilt as to the charges of Aggravated Murder, Murder, and Kidnapping were against the manifest weight of the evidence.

## III.  LEGAL ANALYSIS

### A.  Assignment of Error No. 1

{¶ 26}  In his first assignment of error, Martin argues that the evidence presented by the state was insufficient to convict him of aggravated murder, murder, and kidnapping and that the trial court should have granted his Crim.R. 29 motion for acquittal.

{¶ 27}  Pursuant to Crim.R. 29(A), a court "shall order the entry of a judgment of acquittal of one or more offenses * * * if the evidence is insufficient to sustain a conviction of such offense or offenses."  Because analysis of the evidence for purposes of a Crim.R. 29(A) motion looks at the sufficiency of the evidence, a Crim.R. 29(A) motion and a review of the sufficiency of the evidence are subject to the same analysis.  *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 37.

{¶ 28}  Whether the evidence is legally sufficient to sustain a verdict is a question of law.  *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  Sufficiency is a test of adequacy of the evidence.  *Id.*  We construe the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt.  *State v. Conley*, 10th Dist. No. 93AP-387, 1993 Ohio App. LEXIS 6050.  We now consider the counts against Martin and find that the evidence was sufficient to warrant denial of Martin's Crim.R. 29 motion.

### 1.  Count 1–Aggravated Murder

{¶ 29}  Martin argues that the evidence presented by the state was insufficient to sustain a conviction for aggravated murder.  R.C. 2903.01(A) states that "no person shall purposely, and with prior calculation and design, cause the death of another."  Martin

argues the state did not present, that Martin purposely, and with prior calculation and design, caused the death of Erika Daniels.

{¶ 30} We consider first whether there was sufficient evidence to support that Martin acted purposely in causing Erika's death. R.C. 2901.22(A) states that "[a] person acts purposely when it is the person's specific intention to cause a certain result." Given the extent, severity, and targeted nature of Erika's stab wounds, we conclude that there is sufficient evidence to show purposeful intent. The state presented evidence through the autopsy report that Erika was stabbed 26 times and had targeted wounds at her throat, chest, and vagina, indicating that the person who stabbed her intended for her to die. There was also evidence in the record to support that Martin caused her death. Martin was seen grabbing Erika by the neck, he was found covered in blood at the scene of the crime by police, and his DNA was found on the knives from the apartment and underneath Erika's fingernails.

{¶ 31} Our examination of the record indicates that there was sufficient evidence for the jury to consider whether Martin acted with prior calculation and design. The Supreme Court of Ohio has repeatedly stated that there is no "bright-line test that emphatically distinguishes between the presence or absence of 'prior calculation and design.' Instead, each case turns on the particular facts and evidence presented at trial." *State v. Taylor*, 78 Ohio St.3d 15, 20 (1997); *State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, ¶ 61; *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, ¶ 148. Courts have looked at numerous factors in analyzing prior calculation and design issues. In *Taylor*, the court looked at three factors: (1) did the accused and victim know each other, and if so, was that relationship strained?; (2) did the accused give thought or preparation to choosing the murder weapon or murder site?; and (3) was the act drawn out or "an almost instantaneous eruption of events?" *Id*. at 19. "[P]rior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes," *State v. Coley*, 93 Ohio St.3d 253, 264 (2001), as long as the killer's actions "went beyond a momentary impulse and show that he was determined to complete a specific course of action." *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, ¶ 46; *State v. Small*, 10th Dist. No. 06AP-1110, 2007-Ohio-6771, ¶ 12.

{¶ 32} Here, there was sufficient evidence for a jury to find that Martin acted with prior calculation and design. Martin himself testified that he and Erika knew each other and were in a relationship that was volatile, with him describing the relationship as "up and down." There was also evidence in the record from which the jury could find that Martin was determined to complete a specific course of action, even if quickly conceived. Testimony from trial indicates that within minutes, Erika was seen screaming for help, Martin was seen dragging her by the neck back through the apartment window, and that she was stabbed 26 times prior to police arriving. This court has held that the manner of killing can support the finding of prior calculation and design. *State v. Carson*, 10th Dist. No. 05AP-13, 2006-Ohio-2440, ¶ 27. Evidence in the record could allow the jury to find that Martin conceived and executed the plan to kill Erika by the targeted areas where she was stabbed, including her chest, vagina, and neck to the point of its mutilation.

### 2. Count 3—Murder

{¶ 33} Martin also argues that the state did not present sufficient evidence to support a jury finding that he purposely caused Erika's death. R.C. 2903.02(A) states that "[n]o person shall purposely cause the death of another." As we have already discussed above, we disagree. There was sufficient evidence for a jury to conclude that Martin acted with the specific intention to cause Erika's death.

### 3. Count 5—Kidnapping

{¶ 34} Count five, kidnapping, required the state to prove that Martin restrained Erika's liberty by force, threat, or deception. R.C. 2905.01(A) states that "no person, by force, threat, or deception, * * *, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes: * * * (3) to terrorize, or to inflict serious physical harm on the victim or another." Martin argues that his testimony indicates that, in restraining Erika and dragging her back into the apartment, he was attempting to prevent Erika from harming herself. Martin's alternative theory, however, does not negate that the state presented sufficient evidence for a jury to find Martin committed kidnapping. Mitchell and Lemon both testified that they saw Erika attempting to flee the apartment, that they heard her calling for help, and that they saw Martin grab Erika by the throat and drag her back inside the apartment. Based on this evidence, a jury could determine that Martin kidnapped Erika by forcefully grabbing

her by the neck and dragging her back into the apartment, thereby restraining her of her liberty, as she was trying to flee the apartment.

### 4. Count 2—Aggravated Murder, Kidnapping

{¶ 35} Martin next argues that there was not sufficient evidence for the jury to determine that he purposely caused Erika's death while committing or attempting to commit kidnapping. R.C. 2903.01(B) states that "[n]o person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping." As we have already determined, there was sufficient evidence to find that Martin forcefully restrained Erika of her liberty and that he acted purposely in causing her death. There was also evidence in the record to support that he caused her death *while* he was committing kidnapping. The state's evidence indicated to the jury that there was a short period of time between the witnesses seeing Martin and Erika at the apartment window and when police arrived to find Erika severely and fatally injured. We conclude that there was sufficient evidence to support Count 2's presentation to the jury.

{¶ 36} Having found that the state presented sufficient evidence for a jury to convict Martin of the various counts, we overrule his first assignment of error.

### B. Assignment of Error No. 2

{¶ 37} In Martin's second assignment of error, he argues that his convictions were against the manifest weight of the evidence.

{¶ 38} When presented with a manifest weight argument, an appellate court engages in a limited weighing of the evidence to determine whether sufficient competent, credible evidence supports the jury's verdict. *State v. Salinas*, 10th Dist. No. 09AP-1201, 2010-Ohio-4738, ¶ 32, citing *Thompkins*, 78 Ohio St.3d at 387. We note that an appellate court reviewing a manifest weight challenge to a criminal conviction "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *Thompkins* at 387. An appellate court should reserve reversal of a conviction as being

against the manifest weight of the evidence for the most "exceptional case in which the evidence weighs heavily against the conviction." (Internal quotations omitted.) *State v. Cervantes*, 10th Dist. No. 18AP-505, 2019-Ohio-1373, ¶ 27.

{¶ **39**} Martin rests his manifest weight argument on the arguments he made in support of his first assignment of error, regarding sufficiency of the evidence. He argues only that his convictions were against the manifest weight of the evidence because the state presented *insufficient* evidence. However, we have already found that the evidence was sufficient for a rational fact finder to convict Martin of the counts against him. Martin offers no further argument to suggest that the verdict, based on sufficient evidence, was against the manifest weight of the evidence. Because Martin fails to meet the high burden of demonstrating that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, we overrule his second assignment of error.

## IV. CONCLUSION

{¶ **40**} We overrule Martin's first and second assignments of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BEATTY BLUNT and MENTEL, JJ., concur.

———————————