OPINION *Page 2 
{¶ 1} Plaintiff-appellant Brenda McKenzie appeals the June 21, 2006 Judgment Entry of the Richland County Court of Common Pleas, granting summary judgment in favor of Defendant-appellee Meijer, Inc. ("Meijer").
 STATEMENT OF THE FACTS AND CASE {¶ 2} Appellant Brenda McKenzie worked for the Meijer retail store on North Lexington Springmill Road in Mansfield, Ohio from November 27, 1997, to January 23, 2004. Appellant's responsibilities included acting as the Team Leader of the Women's Department, as well as assuming various roles as needed. On Friday May 26, 2000, while working as a cashier, Appellant injured her back lifting and placing an item of merchandise into a customer's shopping cart. Appellant reported the injury on May 29, 2000, and sought medical treatment on May 30, 2000.
 {¶ 3} Appellant filed a workers' compensation claim for her back injury, which was subsequently allowed for the condition of lumbosacral strain/sprain. Appellant received medical benefits and temporary total disability payments, retroactive from May 30, 2000, until such time it was determined Appellant achieved maximum medical improvement.
 {¶ 4} In late 2000, Appellant's physician diagnosed she suffered a herniated disc to the spine, and her condition required surgery. Appellee contested the physician's recommendation.
 {¶ 5} Appellant has not returned to work, and alleges she continues to experience extreme pain and requires intensive medical treatment and pain management. *Page 3 
 {¶ 6} In November and December 2002, Meijer suspended payment of Appellant's temporary total disability payments. In January, 2003, Meijer backdated payment to Appellant of the benefits.
 {¶ 7} On January 23, 2004, Appellant received a letter by certified mail from Tom Ivan, the Store Director, advising Appellant her employment had been terminated due to corporate reorganization.
 {¶ 8} The Meijer corporate reorganization was designed to reduce the total number of mid-level management employees, including Team Leaders. All together, Meijer terminated approximately 1,500 employees throughout the company. Meijer implemented the reduction in force by a rating and ranking evaluation completed by the store director for each store. Tom Ivan was charged with reducing the number of Team Leaders at the Mansfield store. Meijer provided the store directors with training and written materials to guide them in making the decision who to terminate. Accordingly, Ivan evaluated each employee in ten separate categories and assigned certain numerical values to each. The sum of the numerical values given in these categories provided each employee with a raw score, which provided a rank order. In evaluating Appellant, Ivan testified at deposition he used the Team Leader Assessment results obtained in early 2000, while Appellant was working as a Team Leader, and his memory of Appellant's performance during her five months in the position.
 {¶ 9} Appellant was ranked 31st out of 34 Team Leaders, and was tentatively identified as a Team Leader to be terminated as part of the reorganization. Upon concluding the evaluations were conducted in accordance with the standards *Page 4 
established by the company and determining there was not another store to transfer Appellant to, the decision was made to terminate Appellant's employment.
 {¶ 10} Prior to sending the January 23, 2004 letter, Ivan's secretary called Appellant and advised her Ivan wanted her to come to the store for a meeting. Appellant refused to attend the meeting, and directed Ivan's secretary to forward any correspondence to her attorney.
 {¶ 11} Following her termination, Appellant initiated this action alleging: retaliatory discharge, in violation of R.C. 4123.90; tortious wrongful discharge, in violation of R.C. 4123.90; tortious wrongful discharge, in violation of R.C. 4123.56; and tortious denial of workers' compensation benefits.
 {¶ 12} On April 13, 2006, Meijer filed a motion for summary judgment. On June 21, 2006, via Judgment Entry, the trial court granted Meijer's motion, dismissing all of Appellant's claims.
 {¶ 13} Appellant now appeals, assigning as error:
 {¶ 14} "I. THE TRIAL COURT ERRED IN GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S FIRST CAUSE OF ACTION FOR RETALIATORY DISCHARGE IN VIOLATION OF OHIO REVISED CODE § 4123.90.
 {¶ 15} "II. THE TRIAL COURT ERRED IN GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S SECOND CAUSE OF ACTION FOR TORTIOUS WRONGFUL DISCHARGE IN VIOLATION OF OHIO PUBLIC POLICY AS ESTABLISHED BY OHIO REVISED CODE § 4123.90.
 {¶ 16} "III. THE TRIAL COURT ERRED IN GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S THIRD CAUSE OF ACTION FOR *Page 5 
TORTIOUS WRONGFUL DISCHARGE IN VIOLATION OF OHIO PUBLIC POLICY AS ESTABLISHED BY OHIO REVISED CODE § 4123.56 AND COOLIDGE V. RIVERDALELOCAL SCHOOL DISTRICT (2003), 100 OHIO ST.3D 141.
 {¶ 17} "IV. THE TRIAL COURT ERRED IN GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S FOURTH CAUSE OF ACTION FOR TORTIOUS DENIAL OF WORKERS' COMPENSATION BENEFITS."
 {¶ 18} Summary judgment proceedings present the appellate court with the unique opportunity of reviewing the evidence in the same manner as the trial court. Smiddy v. The Wedding Party, Inc. (1987),30 Ohio St.3d 35, 36, 506 N.E.2d 212.
 {¶ 19} Civ.R. 56(C) states, in pertinent part:
 {¶ 20} "Summary Judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law * * * A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor."
 {¶ 21} Pursuant to the above rule, a trial court may not enter a summary judgment if it appears a material fact is genuinely disputed. The party moving for summary judgment bears the initial burden of informing the trial court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a *Page 6 
genuine issue of material fact. The moving party may not make a conclusory assertion that the non-moving party has no evidence to prove its case. The moving party must specifically point to some evidence which demonstrates the non-moving party cannot support its claim. If the moving party satisfies this requirement, the burden shifts to the non-moving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. Vahila v. Hall (1997),77 Ohio St.3d 421, 429, 674 N.E.2d 1164, citing Dresher v. Burt (1996),75 Ohio St.3d 280, 662 N.E.2d 264.
 {¶ 22} It is based upon this standard we review Appellants' assignments of error.
 I, II, III {¶ 23} Appellant's first three assignments of error raise common and interrelated issues; therefore, we will address the arguments together.
 {¶ 24} Appellant first asserts the trial court erred in granting Meijer summary judgment in violation of R.C. 4123.90.
 {¶ 25} The statute reads:
 {¶ 26} "No employer shall discharge, demote, reassign, or take any punitive action against any employee because the employee filed a claim or instituted, pursued or testified in any proceedings under the workers' compensation act for an injury or occupational disease which occurred in the course of and arising out of his employment with that employer."
 {¶ 27} Specifically, Appellant asserts Meijer's sole reason for terminating her position stemmed from her workers' compensation claim and receipt of benefits therefrom. *Page 7 
 {¶ 28} In order to prove a prima facie case for retaliatory discharge, Appellant must establish she was injured on the job, filed a workers' compensation claim, and was discharged in contravention of R.C. 4123.90.Kilbarger v. Anchor Hocking Class Co. (1997), 120 Ohio App.3d 332. Where, as here, a plaintiff establishes a prima facie case under R.C. Section 4123.90, the employer must set forth a legitimate non-retaliatory reason for the discharge. Id. If the employer provides a non-retaliatory reason for the discharge, the employee must establish the employer's stated reason was false or a pretext for discrimination.White v. Mt. Carmel Med. Ctr. (2002), 150 Ohio App.3d 316.
 {¶ 29} An employer's business decision is not an absolute defense to unlawful discrimination. Hall v. Banc One Mgt. Corp. 2006-Ohio-913;Reeves v. Sanderson Plumbing Products, Inc. (2000), 530 U.S. 133. The reasonableness of an employer's decision is critical in determining whether the proffered reason was the employer's actual motivation.Hall, supra.
 {¶ 30} Appellant maintains her termination violated R.C. 4123.90 in contravention of the statute, and she successfully asserted a common law wrongful discharge claim. Appellant notes the Ohio Supreme Court decision in Coolidge v. Riverdale Local School District (2003),100 Ohio St.3d 141, stating:
 {¶ 31} "In our opinion, the policy of protection embodied in the Workers' Compensation Act can be effectuated only if an employer is not permitted to discharge an employee for being absent from work due to an allowed injury for which the employee is receiving TTD compensation. We hold, therefore, that an employee who is receiving TTD compensation pursuant to R.C. 4123.56 may not be discharged solely on *Page 8 
the basis of absenteeism or inability to work, when the absence or inability to work is directly related to an allowed condition."
 {¶ 32} Based upon the above, Appellant cites Ivan's deposition testimony arguing the only thing Ivan knew about Appellant at the time he terminated her employment was she was on extended medical leave due to her workers' compensation claim.
 {¶ 33} In context, Ivan testified:
 {¶ 34} "Q. What information did you use to determine which employees would lose their employment in connection with that restructuring in 2004?
 {¶ 35} "A. Um, the results of a, ah, a nine, approximately, nine category-type, ah, evaluation.
 {¶ 36} "* * *
 {¶ 37} "Q. What categories were on that nine category evaluation?
 {¶ 38} "A. Um, I don't recall all nine, I can remember a few.
 {¶ 39} "Q. Which ones can you remember?
 {¶ 40} "A. Ah, one was Length of Service.
 {¶ 41} "Q. Other than Length of Service, do you recall any other category?
 {¶ 42} "A. Ah, Leadership, it was like, um, something about Leadership.
 {¶ 43} "Q. Some type of general Leadership category?
 {¶ 44} "A. Well, I think it said, it was more specific like saying, ah, Proven, I think was the word, Proven Leadership Ability.
 {¶ 45} "Q. Other than Length of Service and Proven Leadership Ability, were there any other categories you can remember?
 {¶ 46} "A. Um, Integrity. *Page 9 
 {¶ 47} "Q. Other than those three categories, do you recall any others?
 {¶ 48} "A. Um, not specifically, no.
 {¶ 49} "Q. And when you say, the results were of an evaluation, who performed that evaluation?
 {¶ 50} "A. I don't understand your question.
 {¶ 51} "Q. Earlier you testified that you looked at these nine category evaluations, who made that evaluation?
 {¶ 52} "A. I did.
 {¶ 53} "Q. You did?
 {¶ 54} "A. Well, I didn't come up with the evaluation, if that's what you mean.
 {¶ 55} "Q. Well, you didn't come up with the criteria for the evaluation; correct?
 {¶ 56} "A. Correct.
 {¶ 57} "Q. But you did make the evaluation?
 {¶ 58} "A. Yes.
 {¶ 59} "Q. Did you use any of the information contained within Exhibit 1 to assist you in making the decision to terminate Miss McKenzie's employment?
 {¶ 60} "A. The Team Lead Summary I reviewed, yes.
 {¶ 61} "Q. You reviewed it prior to making a decision about her employment; is that correct?
 {¶ 62} "A. Well, um. Specifically, I looked at this (indicating) to help me with the nine criterion because I had limited recollection and knowledge of her, for her limited amount of time, and I was, you know, not the Store Director there the whole time that *Page 10 
she was at that store, so, um, I helped, this helped assist me on some of those specific categories.
 {¶ 63} "* * *
 {¶ 64} "Q. Other than Length of Service, Leadership and Integrity, you can't recall any of the other categories used?
 {¶ 65} "A. I would be guessing, but the content would have been things like, team — well, almost like what's on here (indicating), things like Teamwork or whatever, but those are the ones that I do remember specifically, the three that I mentioned.
 {¶ 66} "* * *
 {¶ 67} "Q. What else did you look at?
 {¶ 68} "A. There was a, a binder, if you will, that was supplied by our company to help guide us through this, ah, restructuring process.
 {¶ 69} "Q. What information was in that binder?
 {¶ 70} "A. Um, it included, um, these sheets (indicating), these forms along with, um, other information as to, um, other information as to, um, explaining the whole process of displacement, not displacement, but the reorganization itself, on how to conduct the whole process.
 {¶ 71} "* * *
 {¶ 72} "Q. In what way was Miss McKenzie's Productivity needing improvement?
 {¶ 73} "A. I remember that her, her direct report was not always happy with the level that she was delivering, um, in terms of Productivity, so a lot of my evaluation once, once, once I tried to point this out that, um, doing this evaluation was, was a difficult task not having, um, worked with her as long as I had with the other folks. So a *Page 11 
lot of my recollection was based on memory, rather than, ah, specific. So, um, when it came to Productivity, it was my recollection of what, my memory was of favorable or unfavorable on each of these, um, issues, and I would, you know, on Productivity to cite each specific thing to you, I wouldn't be able to do that, nor would I be able to do that on most of the [sic] other people as well.
 {¶ 74} "Q. But it's true at the time that you completed the Team Leader Evaluation Log, Miss McKenzie hadn't actually worked in the Mansfield Meijer for about three years; is that right?
 {¶ 75} "A. Ah, yeah, at least that.
 {¶ 76} "Q. And you had mentioned something about you had a recollection of someone not being satisfied with her productivity, who was that person you referred to?
 {¶ 77} "A. That would have been Stephanie Cook.
 {¶ 78} "Q. And was Miss Cook Brenda McKenzie's direct Supervisor?
 {¶ 79} "A. Yes.
 {¶ 80} "* * *
 {¶ 81} "Q. What generally does productivity refer to?
 {¶ 82} "A. Um, Productivity as, as it appears on the page, there probably was a specific set of criterion that we should have used, which I don't have access to, so I don't remember.
 {¶ 83} "Q. You don't remember, sitting here today, what that specific criteria referred to?
 {¶ 84} "A. Right.
 {¶ 85} "* * * *Page 12 
 {¶ 86} "Q. Is it true that for all of the categories, all of the nine categories listed on the front page of Exhibit 2, that you relied on the Team Lead Summary in Exhibit 1, to make those rankings?
 {¶ 87} "A. No.
 {¶ 88} "Q. What other information did you look at besides the Team Lead Summary contained in Exhibit 1, to make any rankings with respect to Miss McKenzie on Exhibit 2?
 {¶ 89} "A. Other than my recollection of, of my personal opinions as well as remembering opinions of the people that she reported to, um, that was because of her limited exposure that it was very difficult.
 {¶ 90} "Q. So you relied on your recollection and you relied on your personal opinion?
 {¶ 91} "A. Not opinion, no.
 {¶ 92} "Q. Okay.
 {¶ 93} "A. Person recollection and this Team Lead.
 {¶ 94} "Q. Other than your personal recollection and the Team Lead Summary in Exhibit 1, did you use or rely on any other information in making any of the ranking for Miss McKenzie on Exhibit 2?
 {¶ 95} "A. Did I rely on anything else, yes.
 {¶ 96} "Q. What else did you rely on?
 {¶ 97} "A. Um, I review, no, no, no, there wasn't.
 {¶ 98} "Q. Is that true for any of the nine categories?
 {¶ 99} "A. Um — *Page 13 
 {¶ 100} "Mr. Wilhelms: Pardon my confusion, did you, did he just change his answer?
 {¶ 101} "Ms. Wafer: I don't know, that's what I'm trying figure out.
 {¶ 102} "Mr. Wilhelms: Okay.
 {¶ 103} "A. Do you want to restate the question?
 {¶ 104} "Q. Sure. In an effort to clarify, I believe that you testified that you used your personal recollection and the Team Lead Summary contained in Exhibit 1 to evaluate Miss McKenzie for purposes of the Team Leader evaluation Log in Exhibit 2; is that correct?
 {¶ 105} "A. To the best of my knowledge.
 {¶ 106} "Q. Were there any other sources of information you used to make any of the rankings for Miss McKenzie in Exhibit 2?
 {¶ 107} "A. I can't recall of any others.
 {¶ 108} "Q. None that you can remember?
 {¶ 109} "A. None that I can remember.
 {¶ 110} "Q. And you've testified previously that your personal recollection of Miss McKenzie is vague; correct?
 {¶ 111} "A. To the specifics of her, yes.
 {¶ 112} "Q. And was that also true at the time you did the Team Leader Evaluation Log, was your memory of her vague at the time you completed the Team Leader Evaluation Log?
 {¶ 113} "A. In terms of specifics, yes.
 {¶ 114} "* * * *Page 14 
 {¶ 115} "Q. In what way do you believe Miss McKenzie lacks leadership skills?
 {¶ 116} "A. Well, she didn't have the command of her, her team, based on her Team Lead Score, um, in going through the Team Lead Summary, there's quite a few areas that she appeared to be deficient in terms, when it came to leadership; and as I told you I couldn't remember her specific behaviors, but I remember my overall impression of her, which, um, which was lacking in leadership skills.
 {¶ 117} "Q. Your overall impression of her was that she lacked leadership skills?
 {¶ 118} "A. Yes.
 {¶ 119} "Q. What do you remember about her that makes you say that?
 {¶ 120} "A. I can't cite anything specific at this point because of the limited amount of time that I spent with her, that time lapse over that period of time, just makes it impossible for me to remember.
 {¶ 121} "Q. Did you have any impression of Miss McKenzie?
 {¶ 122} "A. In?
 {¶ 123} "Q. At all?
 {¶ 124} "A. It was not favorable.
 {¶ 125} "Q. And what do you base that on?
 {¶ 126} "A. Based on my memory.
 {¶ 127} "Q. And what about your memory leads you to conclude that your impression of Miss McKenzie was not favorable?
 {¶ 128} "A. I remember that, that the overall performance of her area was not what I said, was, you know, was not, you know, bringing, um, she wasn't bringing, um, she wasn't bringing it, you know, I mean, she just, I mean, you know, when you're dealing *Page 15 
with how many people, you have impressions that, you know, that you, ah, develop over, you know, a period of time and, unfortunately, in her case it was a shorter period of time than that it was with the other Team Leaders.
 {¶ 129} "Q. And so in the time that you would have worked with Miss McKenzie and you developed an unfavorable impression of her, what would you have liked to have seen different with respect to her area?
 {¶ 130} "A. Well, um, the very things that are listed here (indicating), a little bit more command and respect from her people, um, just, just the way the scores show.
 {¶ 131} "* * *
 {¶ 132} "Q. At the time that you completed the Evaluation Log, and the information on Page 2 of Exhibit 2, with respect to your analysis of the employees, were you aware that Miss McKenzie had a pending Workers' Compensation Claim open against Meijer, Incorporated?
 {¶ 133} "A. I don't believe I did.
 {¶ 134} "Q. You know that information now, correct?
 {¶ 135} "A. Yes.
 {¶ 136} "Q. Do you know when you first learned that information?
 {¶ 137} "A. No.
 {¶ 138} "Q. At the time you completed both pages contained within Exhibit 2, you were aware that Miss McKenzie wasn't actively working at the Meijer's store in Mansfield; correct?
 {¶ 139} "A. That's correct.
 {¶ 140} "Q. How did you have that knowledge? *Page 16 
 {¶ 141} "A. She wasn't there.
 {¶ 142} "Q. Did you have an understanding about why she wasn't there?
 {¶ 143} "A. Yes.
 {¶ 144} "Q. What was your understanding at that time?
 {¶ 145} "A. She was out on medical leave.
 {¶ 146} "Q. Do you know the nature of that medical leave?
 {¶ 147} "A. Ah, yes.
 {¶ 148} "Q. What was your understanding of that?
 {¶ 149} "A. That she had some back problems."
 {¶ 150} "* * *
 {¶ 151} "Q. When you completed the documents in Exhibit 2, is it fair to say, you were aware that Miss McKenzie was on a medical leave for a back problem?
 {¶ 152} "A. Yes.
 {¶ 153} "Q. And did you have an understanding at that time that, that medical leave was the product of some type of claim that Miss McKenzie had, had a work-related injury?
 {¶ 154} "A. Yes."
 {¶ 155} Tr. at 32-61.
 {¶ 156} Appellant notes the January 23, 2004 termination letter from Tom Ivan, read:
 {¶ 157} "You were contacted on January 22, 2004 for the purpose of setting up a time to meet to discuss the "new normal" at Meijer and how this transformation affects *Page 17 
you. Because you refused to meet with me, this letter is being sent to inform you that your position has been eliminated and that you are eligible for a severance package."
 {¶ 158} Appellant cites the January 23, 2004 letter as evidence she was terminated based upon her workers' compensation claim. We disagree. Read in context, the letter demonstrates Appellant was informed of her termination by letter, instead of in person, because she would not come to a meeting.
 {¶ 159} In addition, Tom Ivan testified at deposition:
 {¶ 160} "Q. What did you intend to say to Miss McKenzie in the meeting you had requested?
 {¶ 161} "A. I would have, um, there was, ah, prepared, um, ah, form part of that, ah, packet that I mentioned earlier that included, ah, ways of delivering a message that she, that she would have been displaced.
 {¶ 162} "Q. The purpose of the meeting was to let her know that her position had been eliminated?
 {¶ 163} "A. Yes, and also to, um, cover a severance package that was available.
 {¶ 164} "Q. In that second paragraph, the second line, second sentence rather, it states, Because you refuse to meet with me, this letter is being sent to inform you that your position has been eliminated and that you're eligible for a severance package; is that correct?
 {¶ 165} "A. That's how it's stated, yes.
 {¶ 166} "Q. It's not true that Miss McKenzie's position was eliminated, or she was displaced because she refused to meet with you?
 {¶ 167} "A. No. *Page 18 
 {¶ 168} "Q. At the time the letter was sent on January 23rd, 2004, had you already made that decision about her displacement?
 {¶ 169} "A. Yes."
 {¶ 170} Tr. at 71-72.
 {¶ 171} Upon review of the deposition testimony and evidence presented for purposes of summary judgment, Ivan's testimony does not demonstrate Appellant was singled out for termination based upon her workers' compensation claim. At the time of the evaluation and subsequent termination, Appellant was still an employee for purposes of reduction, and Meijer terminated more than 1,500 employees as part of the company-wide reorganization. Although we recognize the imperfections of Meijer's evaluation process, the evidence demonstrates Meijer attempted to implement a review process in a non-discriminatory manner; not as a pretext for terminating Appellant due to her workers' compensation claim.
 {¶ 172} Accordingly, we overrule Appellant's first, second and third assignments of error.
 IV. {¶ 173} In the fourth assignment of error, Appellant argues the trial court erred in granting Meijer's motion for summary judgment as to Appellant's claim for tortious denial of workers' compensation benefits.
 {¶ 174} In Balyint v. Arkansas Best Freight Sys. (1985),18 Ohio St.3d 126, the Ohio Supreme Court held an employee of a self-insured employer may maintain a cause of action against the employer for the intentional and wrongful termination of workers' compensation payments. *Page 19 
 {¶ 175} Again, Appellant cites R.C. 4123.90 prohibiting "any punitive action" against an employee because of the filing of a worker's compensation claim.
 {¶ 176} Appellant argues Meijer failed and refused to allow her to promptly obtain medically necessary prescription medications to treat her back pain through "a nonsensical approval process, which resulted in many delays" in the receipt of her prescription pain medication.
 {¶ 177} Specifically, Appellant cites Meijer's procedure allowing her to fill her prescription at the Meijer pharmacy to avoid out-of-pocket expenses, without having to be reimbursed by Meijer. Appellant admits she was not required to have her prescriptions filled at the store, and could go to another retail pharmacy. However, in order to avoid out-of-pocket expenses, Meijer required employees to obtain administrative approval.
 {¶ 178} Appellant argues her family members encountered hostility from the staff at Meijer, and unnecessary delays due to the need for the prescriptions to be stamped with approval by the secretary in the business office. Appellant acknowledges her physician would only write prescriptions for two weeks worth of medication; requiring her to fill the medication often.
 {¶ 179} Based upon the above, the evidence does not demonstrate Meijer delayed or denied Appellant's compensation under her claim. Meijer voluntarily offered its employees a procedure to fill prescriptions in the store in an effort to avoid out-of-pocket expenses, after receiving administrative approval, as a benefit to the employees; not as a means of discrimination. Appellant was free to have her prescriptions filled elsewhere, pay the out-of-pocket expense, and wait for reimbursement. *Page 20 
 {¶ 180} Appellant has not met her burden of demonstrating Meijer tortiously denied her workers' compensation benefits. Accordingly, Appellant's fourth assignment of error is overruled.
 {¶ 181} The June 21, 2006 Judgment Entry of the Richland County Court of Common Pleas is affirmed.
 Hoffman, P.J., Farmer, J., and Edwards, J., concur. *Page 21 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the June 21, 2006 Judgment Entry of the Richland County Court of Common Pleas is affirmed. Costs assessed to appellant. *Page 1