[Cite as *Thevenin v. White Castle Mgt. Co.*, 2018-Ohio-2694.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Victor A. Thevenin, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 17AP-255 |
| v. | : | (C.P.C. No. 13CV-11789) |
| White Castle Management Company, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on July 10, 2018

**On brief:** *Livorno and Arnett Co., LPA*, and *Henry A. Arnett*, for appellant. **Argued:** *Henry A. Arnett*.

**On brief:** *Porter, Wright, Morris & Arthur LLP, Diane C. Reichwein*, and *Jamie A. LaPlante*, for appellee. **Argued:** *Diane C. Reichwein*.

APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Plaintiff-appellant, Victor A. Thevenin, appeals a decision of the Franklin County Court of Common Pleas finding in favor of defendant-appellee, White Castle Management Company, on appellant's claim of retaliation under R.C. 4123.90. We affirm the trial court.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} Appellee hired appellant in 2004 as a part-time "watchman." (Tr., Pl.'s Ex. 2 at 1.) The position of watchman primarily entails hourly "rounds" of the business grounds followed by monitoring security cameras while sitting at a control desk. (Tr., Pl.'s Ex. 2 at 2.) Conducting a round involves walking an approximate one mile route

around appellee's various buildings to check for possible problems. To ensure certain places are checked, the watchman passes a hand-held wand with a Detex system over various points. Without complications, a round could be completed by a healthy watchman in about 25 minutes, leaving 35 minutes for the watchman to sit at the control center.[1] During certain days and times, the round would take longer: 35 minutes to complete the round, leaving 25 minutes at the control desk. If there is a problem or emergency, the watchman must contact an appropriate person or entity to report the problem and, if necessary, use "good judgment" in reacting to the problem, such as turning off the correct water line in the event of a broken sprinkler head, for example. (Tr., Pl.'s Ex. 2 at 3.) It is undisputed that appellant was well qualified for the job.

{¶ 3} John Wheeler, Building Maintenance Supervisor, became appellant's supervisor in about 2010, at which time appellant worked a part-time schedule. In 2012, due to a full-time watchman having health issues and needing reduced hours, appellant's hours increased. By August 2012, appellant was working a daytime/evening Monday through Friday, 40-hour schedule. However, in October 2012, after the watchman with health issues left employment, Wheeler released a schedule in which another watchman was given the 40-hour shift and appellant was given a 32-hour shift whereby he would work 12:15 a.m. to 8:15 a.m. from Monday through Thursday. On October 18, 2012, appellant sent an email to Wheeler and Wheeler's supervisor, Craig Martin, expressing his displeasure with a junior watchman being offered the 40-hour position and appellant's schedule being changed. Appellant offered three schedule options, all of which involved appellant working weekdays and not on weekends. For one option, in which appellant took over the opening created when the other watchman left, appellant noted "I would have taken [the watchman's] position because I didn't want to work weekends, and [the promoted watchman] would have taken my position but he still would have had to work weekends if he wanted the job." (Tr., Def.'s Ex. J at 1.)

{¶ 4} Appellant felt that giving another, somewhat younger watchman 40 hours while his schedule was reduced was due to age discrimination[2] and met with appellee's

---

[1] Appellant testified that a typical round would take 15 to 20 minutes and could be completed in 10 to 15 minutes if the watchman hurried.

[2] Facts related to appellant's age discrimination allegations are provided to the extent they bear on the question of appellant's claim of retaliation under R.C. 4123.90, the subject of this appeal.

Team Member Service staff on October 28, 2012 to discuss his internal age discrimination complaint. By email dated November 1, 2012, appellant appeared to be satisfied that the schedule situation had been resolved. That satisfaction apparently changed when, on November 20, 2012, Wheeler released a new schedule whereby appellant would work 40 hours during the 12:15 a.m. to 8:15 a.m. shift from Sunday morning through Thursday morning. By a letter dated November 28, 2012 entitled "Age Discrimination Complaint," appellant again expressed his belief that he should be able to retain his previous weekday shift or take over the departed watchman's late-night weekday shift. (Tr., Def.'s Ex. T at 1.) According to appellant, his version of adjusting the schedule given the employees at hand was "the only way. There is no other way on Earth you can run the schedule except that way." (Tr. Vol. 1 at 200.) Appellant specifically took issue with working a shift that essentially started late Saturday evening and therefore covered two weekend days, thought the change in schedule to be operationally unnecessary, and believed the change was made in retaliation for appellant making an age discrimination complaint and in order to make him quit. In essence, appellant wanted to continue working weekdays and believed that should be a reward for his "seniority." (Tr. Vol. 1 at 183.)

{¶ 5} The next day, November 29, 2012, appellant was injured on the job when he attempted to turn on lights in a dark conference room, tripped on a box, and fell. Appellant filed a workers' compensation claim shortly thereafter. Appellant returned to work for short periods of time in December 2012 and early January 2013 with intermittent periods of temporary total disability. After an additional week off due to an unrelated medical condition, appellant returned to work on January 15, 2013 and worked the next two days.

{¶ 6} By MEDCO-14 form dated January 16, 2013, appellant's physician indicated that appellant was temporarily not released to any work, including the former position of employment, until March 18, 2013 due to a medial meniscus tear in his left knee. The clinical findings section of the form states "[p]atient tried to RTN but was in too much pain. Dr. Mueller is taking patient back off work @ this time." (Tr., Joint Ex. 2, Jan. 16, 2013 MEDCO-14 at 2.) Around that same day, the same physician completed appellee's internal medical release form in a manner that both indicated that appellant "is totally incapacitated" with a note referencing an upcoming February 18, 2013 surgery and

indicated that appellant can sit (with rest periods), can do certain repetitive tasks bilaterally, can occasionally reach above shoulder level, and can frequently drive. (Tr., Def.'s Ex. Y, Jan. 17, 2013 Medical Release Form at 1.)

{¶ 7} Appellee, through a third-party administrator, scheduled appellee to work at a "Modified Duty Off-Site Program" with hours from Monday to Friday. (Tr., Joint Ex. 4, Jan. 18, 2013 Letter at 1.) Appellant initially agreed to work at the off-site job beginning January 22, 2013. According to appellant, a few days later he told appellee's workers' compensation administrator that he would not report for off-site duty and would be filing a complaint with the Bureau of Workers' Compensation ("BWC"). Before the off-site arrangement could go into effect, appellant's doctor clarified that appellant was not to work at all. Appellee then placed appellant on medical leave for the remainder of January, all of February, and the first few weeks of March.

{¶ 8} During that time, on January 27, appellant filed a complaint with the BWC alleging appellee had not complied with parts of the MEDCO-14 form in insisting appellant could work and attempting to place him at the off-site job. On February 6, the BWC noted "some possible mishandling of the administration of the claim" but dismissed the complaint after having found no apparent rules were violated by the employer. (Tr., Joint Ex. 4, Feb. 5, 2013 BWC Letter at 1.)

{¶ 9} In late February, appellant had arthroscopic surgery to repair the torn meniscus after which, on March 6, another MEDCO-14 form was sent to appellee. In it, appellant's physician permitted appellant to return to work and provided the "only restriction is that he is only to walk 3 [hours] per 8 [hour] shift." (Tr., Joint Ex. 2, Mar. 6, 2013 MEDCO-14 at 2.) Appellant had a "walk-through" of the rounds with Wheeler on March 18, where appellant averaged just under 35 minutes per round over 5 rounds. (Tr. Vol. 1 at 251.) Appellee approved a temporary schedule for appellant consisting of 36.5 hours a week spread over abbreviated night shifts from Sunday through Thursday whereby appellant would complete 5 rounds per shift and walk a maximum of 3 total hours. According to Wheeler, appellant texted him "ok I'll be there per the schedule." (Tr., Def.'s Ex. KK at 1.)

{¶ 10} Appellant started working again on March 27, 2013. That same day, appellant sent Heather Ward, Senior Director of Benefits and Team Member Services, an

email entitled "Discrimination Complaint"[3] which rehashed the schedule change in late 2012, contended that he was ordered into work on March 18 so that Wheeler could conduct what was essentially a medical assessment of his ability to return to work, and alleged that Wheeler was "both attempting once again to cut [his] hours and have [him] work on a Saturday." (Tr., Def.'s Ex. LL at 1.) According to appellant, if he was put back on his Monday through Friday, 40-hour shift, he "could drop the discrimination complaint" and "also wouldn't have to bring up an ADA complaint that [he's] being treated differently from [other watchmen] due to their mobility problems." (Tr., Def.'s Ex. LL at 2.) Ward responded indicating that Bozana Byers, Team Member Services Senior Manager, would formally investigate the assertions.

{¶ 11} The next day, March 28, 2013, appellant emailed Byers contending the schedule "was done strictly to retaliate against me by taking me off my 2nd shift of Monday-Friday and giving that to the (new duties) younger employee and put me on third shift working weekends." (Tr., Def.'s Ex. PP at 1.) On March 31 and April 1, appellant emailed Byers discussing the scheduling changes in 2012, the schedule change as evidence of retaliation against him due to his age discrimination complaint, and, regarding his disability complaint, discussing he now knew that Wheeler's recent change in start time to 12:30 a.m. (giving other watchman an extra 15 minutes) and "assessment" were mandated by Team Member Services, which would thus necessitate him to file a federal Equal Employment Opportunity Commission ("EEOC") complaint or perhaps have the legal department look into the matter. (Tr., Def.'s Ex. SS at 1.)

{¶ 12} Byers interviewed Wheeler on April 1, 2013. According to Wheeler, he had not discriminated against appellant, did not recall talking to appellant regarding age-related medical issues in September 2012, explained that when Wheeler arrived, appellant was part-time Monday through Thursday, and that when another watchman got sick in 2012, everyone picked up extra time. According to Wheeler, appellant wanted to then keep 40 hours and "keeps trying to switch things around so he works when he wants." (Tr., Def.'s Ex. TT at 2.)

---

[3] Appellant testified this email was not another, separate discrimination complaint but, rather, was appellant "complaining because [he] hadn't heard from the [age discrimination complaint he] filed back in November." (Tr. Vol. 1 at 268.)

{¶ 13} On April 2, appellant sent an email to Ward explaining the "condense[d]," 5.5 hour schedule did not comply with his restriction of walking a maximum of 3 hours in an 8 hour period, the schedule put his health in jeopardy, and what appellant can work is the "3rd shift 12:15am to 8:15am Monday through Friday." (Tr., Joint Ex. 8, Apr. 2, 2013 Email.) Ward responded that the schedule complies with the restrictions by having appellant walk 5 rounds for a total of 2 hours and 55 minutes, that his restrictions does not include not working weekends, and that appellee would need clarification from appellant's physician if appellant did not feel like he could meet his duties.

{¶ 14} On April 4, 2013, appellant sent Ward an email entitled "Age and Disability Discrimination." (Tr., Def.'s Ex. XX at 1.) In it, appellant states:

> As I have advised in past correspondence I told * * * Wheeler I could only work the Monday through Friday shift which is the shift I was on when I was injured. * * * As you know the two past third shift watchman rode carts and did modified rounds which I expected to happen for me also. * * * Instead my pay was docked 15 minutes every day and William Engram stayed over on his shift 15 minutes which became overtime. Of course there is no logical reason for this * * * except for harassment. * * * Lastly, as I reported earlier the restriction I am on is for walking during an 8 hour period and not a 5 hour period as I have already explained all the particulars on that issue and that day is scheduled only because of the other discrimination[.] Further since as required by law that accommodations as discussed with my employer (both John Wheeler and Team Member Services) have not been made and my pay had been reduced I have no choice but to file my complaint with the Ohio Civil Rights Commission and the Federal EEOC. As I had stated in earlier emails I don't believe Team Member Services can investigate itself but that I would talk with the Legal Dept. but that really isn't likely to occur. Also when I return on Monday you can advise me if I will need to continue to call off for that 1:30am Sunday shift at which time I will get a new Medco 14 form which will probably just put me off until June, but I prefer it gets worked out.

(Tr., Def.'s Ex. XX at 1.)

{¶ 15} On April 4, 2013, Wheeler met with appellant to review his yearly performance appraisal. Wheeler scored appellant a 4 out of 5 ("exceeded expectations") in job knowledge, a 3 ("consistently met expectations") in two quality of work categories,

and a 2 ("performed below expectations") in cooperation and safety. (Tr., Pl.'s Ex. 9 at 3.) Regarding cooperation, the performance review states:

> [Appellant's] cooperation with the department and his supervisor has diminished. He does not view his workplace as a "team" environment. In his shift reports he is quick to show discontent with coworkers and belittling to others in the department, even diagnosing a coworkers malady. He uses creative dramatic language to present information and opinion. In his reports he often moves away from his job duties to criticize others, procedures, and the company.

(Tr., Pl.'s Ex. 9 at 2.) Regarding safety, the performance review states: "[Appellant] admitted that he did not follow the watchmen's safety procedures and was not carrying his flashlight on rounds. This directly contributed to causing his injury resulting in cost to the company and lost man hours." (Tr., Pl.'s Ex. 9 at 3.) The summary section of the review states:

> [Appellant] can be a friendly personable team member. He takes his position very seriously. He has prior experience and training with building security. He readily offers suggestions for procedures or improvements with the watchman department.
>
> * * *
>
> [Appellant] must stay current and up to date regarding the building, it's [sic] systems, and procedures as they change and develop. He will communicate directly with his supervisor and use shift reports to provide necessary information. The reports must be brief and to the point. [Appellant] should not elaborate with opinions and unnecessary details that are not pertinent to a watchman's shift report.
>
> * * *
>
> [Appellant] needs to attend any pertinent training or department meetings that are made available to him. He will work with his supervisor and Bob Lewis as part of that training. [Appellant] needs to provide the appropriate reports on every shift even if there is nothing to report. [Appellant] needs to be open to constructive criticism and accept feedback from his supervisor. [Appellant] must improve his communication style whether written or verbal.

(Tr., Pl.'s Ex. 9 at 4.)  The total performance rating of 14 ("consistently met expectations") was a reduction from appellant's previous performance reviews, which had reached as high as 19 ("exceeded expectations") the previous year.[4]  According to Wheeler, unlike his previous managers, Byers had told him that he should not simply give "pat on the back" reviews for the watchmen, but, rather, he should give employees constructive feedback if necessary.  (Tr. Vol. 2 at 465.)  Appellant sent emails to Ward disputing the performance evaluation and stating it is "quite derogatory," "an extreme difference" from past evaluations, and "just more cause for [his discrimination] complaint."  (Tr., Def.'s Ex. YY at 1.)

{¶ 16}  On April 8, 2013, appellant sent Ward an email stating, in reviewing the 5.5-hour schedule, he assumed he was being denied accommodations that several other watchmen received, such as use of a cart.  Ward responded appellee was working under appellant's restrictions and not accommodations made at the request of physicians for the other watchmen.

{¶ 17}  That same day, appellant's physician sent a new MEDCO-14 form specifying appellant can walk no more than 30 minutes at a time followed by a 45-minute rest period.  Appellee placed appellant back on temporary total disability leave while it considered the schedule.

{¶ 18}  By letter to appellant dated April 9, 2013, Ward relayed appellee's position that following an investigation by Byers, appellant's various claims of discrimination and retaliation due to age could not be substantiated.  The unsubstantiated claims included appellant's contention that his medical restrictions were not being followed, that appellee was not meeting accommodations required by law, and that his performance evaluation was derogatory and discriminatory.

{¶ 19}  In a letter dated April 19, 2013, appellee provided appellant with a temporary rounds schedule to comply with his March 6 and April 8, 2013 restrictions. The letter states in pertinent part:

> Please report to work for your first scheduled shift on Sunday - April 28, -13.

---

[4] Appellant's total performance ratings for previous review periods are as follows: 2004 (16); 2005-2006 (17); 2006-2007 (17); 2007-2008 (17); 2008-2009 (16); 2009-2010 (18); 2010-2011 (18); and 2011-2012 (19).

Your shift time will be 12:15am to 8:15am, see attached schedule sheet. Included with the shift schedule is your watchman rounds schedule. * * *

Please remember it is your responsibility to monitor your walking periods in order to remain in compliance with your restriction. A log sheet will be provided to assist in tracking those times and the area needed to be covered in the next scheduled round. * * * You are still temporarily permitted to use the passenger elevator for other floor access during this restriction period. Due to longer periods of sitting at the front desk, additional clerical or administrative tasks will be provided.

Any issues that would cause you to exceed the established restrictions must be reported to the Building Maintenance Department. If any issues such as this occur, please be sure to directly contact someone from the Building Maintenance call list.

As with all watchmen, properly addressing building issues takes precedence. The appropriate responses must be in accordance with prior training and instructions, whether written or verbal and in the best interest of White Castle, PSB, and the team members.

(Tr., Def.'s Ex. CCC at 1.) Attached to the letter is a work schedule detailing when to begin and when to end walking during each round for each hour of the shift, allowing for 30 minutes of walking with 45 minutes of rest between rounds. The Sunday shift includes 6 rounds for a total of 3 hours of walking and the Monday through Thursday shifts include 5 rounds for 2 and one-half hours of walking.

{¶ 20} Appellant called Wheeler on the morning of Thursday, April 25. According to appellant, he told Wheeler that the schedule would violate his restrictions and that it might be easier for appellant to go back to the doctor and have his restrictions changed, and Wheeler responded by telling appellant he lacked authority to make a change, would contact the appropriate person with these concerns, and would contact appellant later. Appellant decided to work on Sunday, April 28, so he could not be accused of job abandonment. In appellant's view, showing up for work was justified because Wheeler's letter told appellant to report to work on Sunday, during the call Wheeler never told him not to report, and Wheeler did not communicate further with appellant after the call.

{¶ 21} Conversely, according to Wheeler, during the call on April 25, appellant asserted the letter should have been from Risk Management or Team Member Services and then stated that due to his restrictions and rehabilitation concerns, he could work a Monday through Friday shift but not the Sunday shift. According to Wheeler, as things stood after the call, appellant would not work on Sunday, April 28, he would have his doctor change his restrictions to less walking, and appellant should not come to work until contacted by Team Member Services. Wheeler memorialized his conversation with appellant in an email sent that day to Ward, Byers, and several others and made arrangements for another watchman to take the Sunday shift. Wheeler received no further communication from appellant as to whether he should appear for work or how he should conduct the rounds specifically.

{¶ 22} Appellant showed up for work on Sunday, April 28, and the replacement watchman left. Appellant admits he worked the shift by walking more than 30 minutes[5] during each round because he "didn't have a choice." (Tr. Vol. 2 at 351.) According to appellant, the letter was unclear regarding how to handle areas not covered by a round, and "[s]ince there are no instructions on what to check and what not to check, during a round so that the round only took 30 minutes, this can only mean that there can be no deviations from the watchman's duties." (Tr., Joint Ex. 14, Apr. 28, 2013 Email at 1.)

{¶ 23} At the end of his shift, appellant sent Wheeler and Ward an email stating that due to the "letter dated April 19, 2013 and the paragraph stating that the building requirements take precedence[,] I walked 4.5 hours, every round was 45 minutes walking and a half hour sitting." (Ex. at 43, Dec. 1, 2014 Memo. in Opp.) Appellant also left a voicemail for Wheeler with the following message: "Yeah, just per your letter let you know that I walked 4 ½ hours each round, was 45 minutes walking and 1/2 hour sitting, so violation again, bye." (Tr., Def.'s Ex. LLL at 1.)

{¶ 24} Wheeler called appellant and told him not to report to work the next day, Monday. According to Wheeler, appellant contended that Wheeler lacked authority to make such an order, that he would not recognize the order unless it came from Risk Management or Team Member Services, and that he would still come into work. Wheeler

---

[5] According to camera footage, appellant walked 45 minutes the first round, 41 minutes the second round, 41 minutes the third round, 42 minutes the fourth round, 39 minutes the fifth round, and 38 minutes the sixth round.

relayed the conversation to Ward; Ward called appellant and told him not to report for work on Monday.

{¶ 25} On Monday, April 29, appellant sent Ward an email entitled "Schedules." (Ex. 29, Thevenin Dep.)  In it, appellant writes:

> [Three watchmen] have spent their entire career at White Castle as the weekend personnel.  I started that way myself, but through seniority I eventually got off weekends which is your reward for longevity and commitment to the company. We all took the job knowing this and for security work this is extremely common.  With that said, the problems with the schedule began when the weekend personnel were no longer covering the weekends.  The problem now and in the future will be that there is no one to cover for the weekends anymore. If I had not been injured and was still working on the present schedule we would have the same problems. * * * The complaint began when the shift was moved over another day to Sunday which used to be the Saturday/Sunday 3rd shift position.  That is when it became impossible to manage the schedule. * * * The refusal to go back to this sort of schedule led me to believe something else was going on and that's why I complained, but as I said earlier that is irrelevant in this email and that is not the intent of this email. * * *
>
> * * *
>
> * * * I can submit a comprehensive plan for approval of how I will conduct the rounds that would be in accordance with the Doctors restrictions if I worked a Monday-Friday schedule.  I cannot think of any logical plan for Sunday because there are just to[o] many rounds and to[o] much that needs checked without security of the building suffering.  I know the watchmen do not work under direct supervision and it would be difficult for Wheeler to write such a plan especially since he really doesn't know what I do.  I understand that Wheeler has no training or experience in security and there is no problem with that.  He was hired because of his Maintenance experience.  I have tried to help by writing procedures for the Department which you now have.  I guess what I'm saying is trust me on this schedule it will work because it has in the past.

(Ex. 29 at 1-2, Thevenin Dep.)

{¶ 26} That same day, at a meeting between Wheeler, Ward, and Byers, Ward made the decision to suspend appellant while Byers conducted an investigation.  Byers

called appellant and asked him why he showed up for work on Sunday. According to Byers' notes on the call, appellant repeatedly referred her to his emails to Ward. When Byers asked appellant if he talked to Wheeler about the letter, appellant responded that he told Wheeler there would be a problem with the rounds, that Wheeler never got back to him or told him not to come to work, and, so to cover himself, appellant showed up for the shift. Byers asked why appellant violated the restrictions, and appellant again referred her to the email to Ward and stated "[t]he letter said the building takes precedence so that is what I did." (Ex. 30 at 1, Thevenin Dep.) When Byers informed appellant of the suspension, appellant told Byers that the suspension was meaningless, that he would not recognize the suspension unless it was in a letter, that he was in the process of filing a complaint with the BWC, and that he would add his suspension to the complaint.

{¶ 27} Byers met with Ward to present the results of her investigation. Ward decided to terminate appellant on the grounds of insubordination and violating his work restrictions. The ground of insubordination was based on appellant reporting for work on April 28, 2013, telling Wheeler he lacked authority to order him to report for work, and his failure to cooperate with Byers' investigation. The ground of violating his work restrictions was based on appellant walking continuously for more than 30 minutes during each round on April 28, 2013. Appellant was terminated May 1, 2013.

{¶ 28} Appellant filed a complaint with the BWC the next day[6] contending appellee was not complying with doctor's restrictions and not providing him with 40 hours a week in retaliation for appellant previously filing a complaint with the BWC. On July 16, 2013, appellant filed a notice of R.C. 4123.90 violation with appellee. On May 22, 2013, the Self-Insured Complaint Resolution Unit of the BWC found the complaint to be invalid. Appellant filed a request for reconsideration on May 29, 2013; a field officer found that the pertinent administrative code entitled appellant to a hearing on the retaliation matter before the self-insured employers' evaluation board, if he so chose.

{¶ 29} On October 25, 2013, appellant filed a complaint in the Franklin County Court of Common Pleas asserting that after he was injured at work and filed a workers' compensation claim, he was subject to retaliation, discrimination, and punitive action by

---

[6] Appellant dated the complaint and accompanying letter April 29, 2013; the BWC sent appellee notice of the complaint on the day it was filed—May 2, 2013.

appellee, culminating in appellee wrongfully terminating his employment in violation of R.C. 4123.90. Appellee moved for summary judgment on November 14, 2014, and appellant filed a memorandum contra with an attached affidavit and appendix of documents. The trial court struck portions of the affidavit and the attached documents and then found in favor of appellee. Appellant appealed, and in *Thevenin v. White Castle Mgt. Co.*, 10th Dist. No. 15AP-204, 2016-Ohio-1235, we reversed based on the trial court improperly striking portions of the affidavit and the attached documents and remanded the matter to the trial court. On remand, the trial court overruled appellee's motion for summary judgment, and the case proceeded to a bench trial on February 27 through March 3, 2017. At trial, appellant, five witnesses, and an expert on the issue of mitigation testified and 94 exhibits were admitted.

{¶ 30} On March 13, 2017, the trial court filed a decision finding in favor of appellee. The trial court rejected appellant's claim that his 2012-2013 evaluation was either false or pretextual. Regarding the MEDCO-14 form restrictions, the trial court disagreed with how appellee interpreted the restrictions but nonetheless found "there clearly was no retaliatory animus" in those interpretations. (Trial Ct. Decision at 23.) The trial court believed appellant "caused his own fate * * * by his clear insubordination and his violations of his work restrictions" and found appellant did not meet his burden of showing the stated reasons for his termination were pretextual. (Trial Ct. Decision at 24.) Finally, the trial court found that even if appellant had prevailed, he would not be entitled to back pay due to his failure to mitigate his damages.

{¶ 31} Appellant filed a timely appeal to this court.

## II. ASSIGNMENTS OF ERROR

{¶ 32} Appellant presents two assignments of error for our review:

> [1.] The Court of Common Pleas erred by granting judgment in favor of Defendant and dismissing Plaintiff's Complaint.

> [2.] The Court of Common Pleas erred by ruling that Plaintiff, even if he prevailed, would not be entitled to back pay.

## III. STANDARD OF REVIEW

{¶ 33} Appellant does not set forth a standard of review in his brief. A review of appellant's argument shows he essentially challenges the trial court decision as against

the manifest weight of this evidence. *Wurzauf v. Honda of Am. Mfg.*, 3d Dist. No. 14-06-31, 2007-Ohio-1913, ¶ 7 (evaluating appellant's contention the trial court erred in determining Honda did not discharge him in violation of R.C. 4123.90 under manifest weight standard of review); *Quaye v. N. Mkt. Dev. Auth.*, 10th Dist. No. 15AP-1102, 2017-Ohio-7412, ¶ 20 ("In reviewing a decision reached at a bench trial, we utilize a manifest weight standard.").

{¶ 34} The standard of review for manifest weight is the same in a civil case as in a criminal case. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 17. " 'Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other." ' " (Emphasis sic.) *Id.* at ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). "When presented with a challenge to the manifest weight of the evidence, an appellate court may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." *State v. Norman*, 10th Dist. No. 10AP-680, 2011-Ohio-2870, ¶ 8, citing *Thompkins* at 387. *Sparre v. Ohio Dept. of Transp.*, 10th Dist. No. 12AP-381, 2013-Ohio-4153, ¶ 10 (10th Dist.). An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 35} In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses. *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6. However, in conducting such review, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds."

*State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 25, *discretionary appeal not allowed*, 140 Ohio St.3d 1455, 2014-Ohio-4414, citing *State v. G.G.*, 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7.

## IV. DISCUSSION

### A.  First Assignment of Error

{¶ 36}  Under his first assignment of error, appellant contends the trial court erred in granting judgment in appellee's favor because it incorrectly determined the reasons given by appellee for appellant's termination were not pretextual pursuant to the test to support retaliatory discharge under R.C. 4123.90.

{¶ 37}  R.C. 4123.90 states in pertinent part:

> No employer shall discharge * * * or take any punitive action against any employee because the employee filed a claim or instituted, pursued or testified in any proceedings under the workers' compensation act for an injury or occupational disease which occurred in the course of and arising out of his employment with that employer.

{¶ 38}  "[T]he basic purpose of the retaliation statute is to enable employees to freely exercise their rights without fear of retribution from their employers."  (Internal quotations omitted.)  *Onderko v. Sierro Lobo, Inc.*, 148 Ohio St.3d 156, 2016-Ohio-5027, ¶ 16.  " 'The scope of the statute is nevertheless narrow, and R.C. 4123.90 does not prevent an employer from [taking an adverse employment action against] an employee who is unable to perform his or her duties [or] for just and lawful reasons.  The statute protects only against [adverse employment actions] in direct response to the filing or pursuit of a workers' compensation claim.' "  *White v. Mt. Carmel Med. Ctr.*, 150 Ohio App.3d 316, 2002-Ohio-6446, ¶ 36 (10th Dist.), quoting *Sidenstricker v. Miller Pavement Maintenance, Inc.*, 10th Dist. No. 00AP-1146 (Oct. 25, 2001).

{¶ 39}  Pursuant to R.C. 4123.90, "[t]o support a claim for retaliatory discharge, a plaintiff must show that: (1) [he] engaged in a protected activity, (2) [he] was the subject of an adverse employment action, and (3) a causal link existed between the protected activity and the adverse action."  *Baradji v. Zulily*, 10th Dist. No. 16AP-628, 2018-Ohio-304, ¶ 10.  *White* at ¶ 44, quoting *Barker v. Dayton Walther Corp.*, 56 Ohio App.3d 1, 3 (2d Dist.1989) (R.C. 4123.90 " 'prevents an employer from discharging an employee because the employee pursues a workers' compensation claim.' ").  *Onderko* at ¶ 40 ("[A]

prima facie case of retaliatory discharge under R.C. 4123.90 requires a plaintiff to prove only that the employer discharged, demoted, reassigned, or took any other punitive action against the plaintiff in retaliation for the plaintiff's filing a workers' compensation claim or instituting, pursuing, or testifying in any proceedings under the Workers' Compensation Act.").

{¶ 40} "If the plaintiff meets [his] initial burden in establishing a prima facie case, then the burden shifts to the defendant to give a legitimate, non-discriminatory reason for the action." *Baradji* at ¶ 10; *White* at ¶ 37. "If the defendant gives a nondiscriminatory reason, then the plaintiff must show that the articulated reason was only a pretext for the adverse action." *Baradji* at ¶ 10; *White* at ¶ 37.

{¶ 41} In this case, appellant argues the facts of the case "clearly demonstrated a causal link between the protected activity and the adverse action" and that appellee's proffered reasons for terminating appellant—that appellant violated his own work restrictions and was insubordinate—were "clearly pre-textual." (Appellant's Brief at 27, 30.) Appellee counters appellant failed to prove that the reasons given by appellee were merely a pretext for terminating appellant. For the following reasons, we agree with appellee.

{¶ 42} To prove pretext, a plaintiff must prove that the employer's stated reason "(1) had no basis in fact, (2) did not actually motivate the adverse employment action, or (3) was insufficient to motivate the adverse employment action." *Ferguson v. SanMar Corp.*, 12th Dist. No. CA2008-11-283, 2009-Ohio-4132, ¶ 21. *Baradji* at ¶ 16. "The reasonableness of an employer's decision is critical in determining whether the proffered reason was the employer's actual motivation." *McKenzie v. Meijer, Inc.*, 5th Dist. 06CA64, 2007-Ohio-4430, ¶ 29.

{¶ 43} Appellee's first proffered reason to terminating appellant is that appellant violated his work restrictions as stated in the MEDCO-14 form dated April 8, 2013, which stated appellant could walk no more than 30 minutes at a time followed by 45 minutes rest. The trial court characterized appellant's manner or working the rounds on April 28 as "consistent with a studied insolence." (Trial Ct. Decision at 13.) Appellant does not dispute he violated his restrictions but essentially contends he was placed in a situation

where he could either not do his job (and face discipline) or violate his restrictions and report the violations to appellee.

{¶ 44} We disagree that appellant was placed in a situation where he could either not do his job or violate his restrictions. The letter of April 19, 2013 clearly sets forth a schedule for rounds in compliance with his doctor's restrictions and states that "[a] log sheet will be provided to assist in tracking those times and the areas needed to be covered in the next scheduled round." (Tr., Pl.'s Ex. 12 at 1.) Appellant admits he violated his doctor's restrictions by completing the total round in one pass and does not contend any emergency response, for example, contributed to his violating the rounds. Furthermore, appellant does not state how the alleged contradiction or ambiguity in the letter proves that his admitted violation of his restrictions was merely a pretext for discriminating against him for filing a workers' compensation claim and/or complaint. Finally, while appellant mentions in his brief that appellee cited no policy that would support the termination of appellant, the burden of demonstrating a stated reason is insufficient to motivate an adverse action is on appellant in the pretext stage. *Ferguson*.

{¶ 45} Appellee's second proffered reason to terminating appellant is that appellant was insubordinate. Appellant argues the evidence shows that appellant never disobeyed an order by coming in on April 28 but, rather, that he was given a written directive by certified mail to report for work, the order was never changed "with the evidence clearly being that his supervisor did *not* tell him not to report on April 28." (Emphasis sic.) (Appellant's Brief at 32.) The trial court judge thought otherwise, concluding that "[appellant's] conduct on April 28, 2013, was something calculated to place [appellee] in an untenable position." (Trial Ct. Decision at 19.)

{¶ 46} After review of the record, we disagree that the evidence of this case shows appellant was not insubordinate for coming into work on April 28. First, the record documents a history—spanning a period which began prior to his injury and workers' compensation claim and complaint—of appellant resisting and challenging appellee, Wheeler in particular, on being assigned a schedule whereby he would work weekends. Even on April 29, 2013, the day after the shift in dispute here, appellant again challenged the decision to have him work a shift with weekends as against seniority and remarked "[i]f I had not been injured and was still working on the present schedule we would have

the same problems."   (Tr., Def.'s Ex. HHH, Apr. 29, 2013 Email at 1.)   Furthermore, Wheeler's account of the call with appellant on the morning of April 25 supports appellee's insubordination ground.  According to Wheeler, it was understood after the April 25 call that appellant would not report to work that Sunday and should await further communication from Team Member Services prior to reporting back to work.  Wheeler's testimony was supported by his email to other staff of appellee that same day and, in particular, his securing a replacement watchman to cover that shift.  With both appellant and Wheeler telling a different story about the call on the morning of April 25, the credibility of appellant and Wheeler became critical in determining whether appellant was insubordinate in working on April 28.  As noted, the trial court judge, as trier of fact, personally observed both men testify before finding in favor of appellee.

{¶ 47} Furthermore, appellant's brief neither challenges as proper grounds or otherwise addresses appellant's interactions with Wheeler (in telling him he lacked authority to tell him to not report to work on April 29) and Byers (during her investigation of his April 28 work appearance), which the trial court also cited as instances giving rise to appellee's termination ground of insubordination.  As such, appellant has not met his burden in demonstrating error on appeal in this regard.  App.R. 16(A)(7); *State v. Sims*, 10th Dist. No. 14AP-1025, 2016-Ohio-4763, ¶ 11 (stating general rule that an appellant bears the burden of affirmatively demonstrating error on appeal); *State v. Smith*, 9th Dist. No. 15AP0001n, 2017-Ohio-359, ¶ 22 (noting that it is not the duty of an appellate court to create an argument on an appellant's behalf).

{¶ 48} R.C. 4123.90 protects only against adverse employment actions in direct response to the filing or pursuit of a workers' compensation claim.  *White.*  After reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we find the trial court judge, as trier of fact, did not err in determining that under R.C. 4123.90, appellant failed to prove appellee's reasons for his termination were mere pretext for discrimination, and the decision is not against the manifest weight of the evidence.  *Norman* at ¶ 8, citing *Thompkins* at 387.

{¶ 49} Accordingly, we overrule appellant's first assignment of error.

**B.  Second Assignment of Error**

{¶ 50}  Under his second assignment of error, appellant contends the trial court erred in ruling that even if he prevailed, appellant would not be entitled to back pay.  In the first assignment of error, we determined appellant did not prevail on his claim.  As a result, we find this assignment of error to be moot.

{¶ 51}  Accordingly, appellant's second assignment of error is moot.

## V.  CONCLUSION

{¶ 52}  Having overruled appellant's first assignment of error and finding appellant's second assignment of error moot, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

TYACK and DORRIAN, JJ., concur.

————————————